THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EDWARD M. KIRWAN, Defendant-Appellant.

Third District    No. 79-774

Opinion filed May 13, 1981.

Lance Haddix, of Chicago, and Paul David Kelley, legal researcher, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

The defendant, Edward Kirwan, was indicted by the grand jury of Peoria County for the offense of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2)). Following a jury trial in the circuit court of Peoria County, Kirwan was convicted, and sentenced to the Department of Corrections for a term of (25) years. He now appeals from the judgment entered on the jury verdict, raising three issues for our consideration: First, was the evidence presented at trial sufficient to prove him guilty of murder beyond a reasonable doubt; second, did reversible error occur when one of the jurors revealed to the court the fact he overheard his wife discussing Kirwan's trial with some acquaintances; and finally, did the trial court err in refusing to permit defense counsel to cross-examine the State's principal witness with regard to the latter's prior acts of perjury.

The record reveals that sometime during the morning hours of February 8, 1979, Richard Monckton was shot three times and killed in his Peoria home by a murderer wielding a .380 automatic pistol. The only occurrence witness was Brad Abraham, who testified on behalf of the State and identified Monckton's murderer as Edward Kirwan, the defendant. Abraham's testimony was substantially as follows.

About 5 p.m. on February 7, 1979, Abraham was at Kirwan's Peoria home. Shortly thereafter, they were joined by Dennis Ruprecht and Tim Dougherty. The four remained at Kirwan's house for about 2-3 hours, drinking beer and hard liquor. While at Kirwan's, Abraham saw two handguns, a revolver and an automatic.

Subsequently, the four left Kirwan's house and went to Two Brothers' Bar, a Peoria tavern. They remained at Two Brothers' until 12 midnight, drinking pitchers of beer. Abraham testified that while at Two Brothers', the defendant had the automatic tucked into his belt and was wearing the revolver in a holster at his hip.

After Two Brothers' Bar closed, the four decided to continue their drinking at Weedy's Tavern, also located in Peoria. They stayed at Weedy's until approximately 3:30 a.m. At this time the defendant, Abraham, Ruprecht, and a woman they had met at Weedy's, Linda Silva, left to go to Richard Monckton's home. Dougherty did not go with them.

The drinking continued at Monckton's house. Abraham testified that at this time "Richard was talking bad about Ed's wife." Specifically "Dick was saying Ed's wife isn't good enough for Ed." Then Monckton and the defendant began to wrestle. The wrestling lasted about five minutes, after which time the argument between Monckton and Kirwan subsided, but not the drinking. Abraham testified that during the wrestling Kirwan was wearing a hunting knife on his belt and subsequently told Abraham that "I should have slit his [Monckton's] throat." Abraham further testified that Kirwan was still wearing the revolver in a holster at his hip. Ruprecht,

however, was then in the possession of the automatic. Abraham further testfied that Monckton brought out his shotgun, discussed its use with the defendant, and threw it off to his right without pointing it at the defendant.

Sometime following the wrestling, Linda Silva, Ruprecht, and Monckton passed out in the living room. Silva and Ruprecht were sleeping on one of the two living room couches. Monckton was sleeping on a recliner. Abraham and the defendant left for more beer and returned a short time later. By now it was daylight.

Abraham testified that after he and the defendant returned with more beer, they sat in Monckton's living room. Abraham sat alone on the other couch facing Monckton, and Kirwan sat on a chair to Abraham's right. Suddenly Kirwan stood, stated "I'm going to blow this fucker away," and shot Monckton three times. After the shooting, Kirwan said "Nobody talks bad about my wife." Monckton died as a result of the shooting. The ammunition used in the murder was identified as ammunition for a .380 automatic. However, the .380 automatic Abraham stated he had seen in Kirwan's possession earlier that evening was never recovered.

Ruprecht was awakened by the shooting. The defendant said "Let's go," and he left with Ruprecht and Abraham in Ruprecht's vehicle. According to Abraham, while in the car Kirwan said, "I love you guys. I know you guys aint' going to rat on me." In response, Ruprecht stated, "I'm not going to rat on you." Ruprecht then dropped Kirwan off at the latter's house, and drove Abraham home. Monckton's body was subsequently discovered by Linda Silva, who apparently slept through the entire incident.

Abraham underwent strenuous cross-examination at Kirwan's trial. Defense counsel elicited from Abraham the fact that he was involved in a motorcycle accident in 1971 or 1972 that resulted in brain damage and loss of sight in his left eye. Abraham underwent brain surgery at St. Francis Hospital in Peoria, and he admitted that he becomes spacy on occasion. He also admitted heavy alcohol and some drug use. In the course of his recuperation at St. Francis Hospital in Peoria, he said he experienced two seizures and a temperature of 107°. To control the seizures he had been taking dilantin. However, at trial he insisted during cross-examination that dilantin had been prescribed for his pneumonia.

Defense counsel further examined in some detail Abraham's ability to recollect the events which transpired on February 7-8, 1979. Abraham drank a considerable amount of beer before arriving at Monckton's house the early morning hours of February 8, and admitted that while at Monckton's he drank three tequila sunrises, part or all of eight beers, and a shot of brandy. In response to defense counsel's query as to whether or not he was drunk at Monckton's, Abraham replied, "Well, I wasn't—I was

feeling it but I wasn't falling over drunk." He further admitted he did not actually see the gun when the defendant shot Monckton, but he thought Kirwan shot Monckton three times in the chest. In actuality, although Monckot was shot three times, only one bullet struck him in the chest. The remaining two bullets hit Monckton in the back and behind his right ear. Finally, defense counsel obtained from Abraham an admission that he was testifying in exchange for a grant of immunity from prosecution for perjury.

■■ ■ The first issue raised by the defendant on appeal concerns the credibility of Abraham, the only State's witness to positively identify Kirwan as Monckton's killer. The defendant contends that in light of Abraham's incredible, impeached, and contradictory testimony, which he describes as "contrary to human belief and experience," the record fails to support the jury verdict of guilty. The law in this area is well-settled:

> "Unless the evidence is so palpably contrary to the verdict or so unsatisfactory as to raise a reasonable doubt of a defendant's guilt, a reviewing court will not set aside a jury's verdict, for any inconsistencies or discrepancies in the testimony of the witnesses, any possible bias or interest affecting the credibility of the witnesses, and the weight to be attributed to the testimony of the witnesses are matters peculiarly within the province of the jury. This is so because the jury is in a better position to assess each witness' ability to remember and opportunity to observe, weighing any discrepancy in light of all the evidence. *People v. Henderson* (1976), 39 Ill. App. 3d 502, 348 N.E.3d 854." (*People v. Seiber* (1979), 76 Ill. App. 3d 9, 12, 13, 394 N.E.2d 1044, 1048.)

(Accord, *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827.) Viewing, as we must, all of the evidence presented in this case in light most favorable to the prosecution to determine whether any rational trier of fact would have found the defendant Kirwan guilty of murder beyond a reasonable doubt (see *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068; *Crossno*), we cannot conclude that the jury verdict was so palpably erroneous or unsatisfactory that a reversal is warranted. Abraham positively identified the defendant as Monckton's killer. His testimony in this regard is unrefuted. Despite defense counsel's concerted effort to implicate one of the other individuals present at Monckton's house the morning of his death (Ruprecht), there is absolutely no evidence that anyone other than Kirwan shot Monckton. Neither Silva nor Ruprecht were called by the State to testify. Both, however, were called by the defense. Ruprecht was asked only one question on direct examination: Did he shoot Monckton. His answer was in the negative.

With regard to the various facts brought out by defense counsel in his cross-examination of Abraham—Abraham's motorcycle accident and subse-

quent brain surgery, his partial blindness, his occasional "spaciness," his alcohol and drug use, his testimony under immunity—they all have a bearing upon one thing and one thing only; Abraham's credibility as a witness. Weighing the credibility of a witness is particularly within the province of the jury. It is the jury, and not the reviewing court, that witnessed the trial and was afforded the unique opportunity to observe Abraham. Accordingly, it is the jury, and not this reviewing court, that is in the best position to determine whether his testimony is worthy of belief. The jury verdict of guilty evinces its conclusion that despite the impairment of his mental and physical faculties, his drug use, and the grant of immunity, Abraham was believable. The jury obviously found that the numerous defense witnesses who were called to impugn him were not. The cold record does not compel us to disturb this finding. "We cannot rule that evidence is insufficient for conviction merely because it consists of bizarre incidents related by less than respectable citizens." *People v. Kester* (1979), 78 Ill. App. 3d 902, 907, 397 N.E.2d 888, 892.

The second issue raised by defendant is whether reversible error occurred when one of the jurors informed the court that he overheard his wife discussing Kirwan's trial with some acquaintances, but was allowed to remain on the jury. The record discloses that during the trial juror Gale Randall revealed to the court that he overheard his wife telling someone over the telephone that Kirwan would not receive the death penalty if convicted. Following this revelation, the court asked juror Randall if he would be influenced in any way by what he heard his wife say, whether what he heard would affect in any way his thinking or judgment in acting as a juror and reaching a verdict, and whether what he heard would prevent him from being completely fair and impartial. Juror Randall responded "no" to each of these questions. He was then asked by the court if he would "lay aside what you heard and base your verdict or verdicts in the case entirely on the evidence presented in the courtroom and the law given to you by the Court." He answered this question affirmatively. Both the State's attorney and defense counsel indicated that they were satisfied with Mr. Randall's answers, and neither made a motion to exclude him from the jury.

Later in the trial, Mr. Randall indicated that he wished to once again address the court. In the absence of the other jurors, Randall clarified the circumstances under which he heard the death penalty comment. Under questioning by defense counsel, he reaffirmed that he would be fair and impartial, and was not affected in any way by what he had heard. Defense counsel again indicated that he was satisfied with juror Randall's responses, and made no motion to exclude him.

■■ It is manifestly evident from the foregoing that defense counsel never objected to Gale Randall's retention on the jury during the trial. Further,

an examination of defendant's post-trial motion reveals that he does not therein assert as error the trial court's failure to exclude Randall after he disclosed he had obtained extraneous information. It is well settled that error is not preserved on appeal if it is neither objected to at trial nor asserted in a post-trial motion. (*People v. Cook* (1979), 78 Ill. App. 3d 695, 397 N.E.2d 439; *People v. Guynn* (1975), 33 Ill. App. 3d 736, 338 N.E.2d 239.) As a consequence, the defendant in the instant case has waived any error concerning juror Randall's retention for purposes of appellate review.

Finally, the defendant contends that the trial court erred in refusing to allow defense counsel to impeach Abraham by bringing to the jury's attention the fact that Abraham committed perjury while testifying in the Woodford County case of People v. Clarence Bradshaw (76-TR-713) on March 31, 1976, and that he was paid $5 by the defendant Bradshaw in exchange for his perjury. However, it is apparent that Abraham was never charged or convicted of the crime of perjury. (Ill. Rev. Stat. 1979, ch. 38, par. 32—2.) Consequently, defense counsel was attempting to impeach Abraham with proof of a prior specific act of misconduct.

■■ According to one authority on Illinois evidence law, impeachment of a witness with evidence of prior acts of misconduct not leading to a conviction is expressly prohibited. (E. Cleary & M. Graham, Handbook of Illinois Evidence §608.5 (3d ed. 1979).) "Inquiry with respect to specific acts of misconduct is barred on the ground that such examination is regarded as overly prejudicial in relation to its probative value." (E. Cleary & M. Graham, Handbook of Illinois Evidence §608.5, at 282 (3d ᴇd. 1979).) Other authorities indicate, however, that such evidence is admissible subject to the discretionary control of the court. (S. Gard, Illinois Evidence Manual Rule 22:12 (2d ed. 1979); McCormick, Handbook on the Law of Evidence §42 (2d ed. 1972).) Although the complete prohibition of such evidence may be the preferred rule (see McCormick), applying the abuse of discretion standard we do not believe the lower court committed reversible error in ruling that the evidence relating to Abraham's prior perjury was not to be heard by the jury. Although Abraham's credibility was a crucial issue at Kirwan's trial, and proof that Abraham lied under oath for money on a previous occasion was certainly relevant, defense counsel's offer of proof reveals that the complete impeachment of Abraham with proof of this prior misconduct would have necessitated the testimony of three additional witnesses. One of these witnesses was Clarence Bradshaw, who was not only the defendant in the trial at which Abraham committed perjury, but was also the person who suborned the perjury from Abraham. Allowing Bradshaw to testify would have no doubt opened the door to additional time-consuming impeachment, which would have done little more than distract the jury

from the main issue in the case, Kirwan's guilt. Further, in light of the testimony of the numerous defense witnesses who attacked Abraham's credibility and veracity during the course of the trial, the impeachment of Abraham with proof of his prior perjury would merely have been cumulative. The trial court did not err in refusing to allow the impeachment of Abraham with evidence of specific prior bad acts.

For the reasons we have heretofore stated, we affirm the judgment of the circuit court of Peoria County.

Judgment affirmed.

SCOTT, P. J., and HEIPLE, J., concur.