JOHN PAUL KELLEY, JR., Plaintiff-Appellee, v. AMERICAN MOTORS CORPORATION, Defendant-Appellant.

Fifth District   No. 5—82—0333

Opinion filed January 29, 1985.

Allen D. Churchill and Joseph B. McDonnell, both of Churchill, Nester & McDonnell, of Belleville, and Richard Lee Blatt, Thomas F. Lucas, and Patricia M. Relosky, all of Peterson, Ross, Schloerb & Seidel, of Chicago, for appellant.

Edward J. Kionka, of Kionka & Associates, of Carbondale, and Morris B. Chapman, of Chapman & Carlson, of Granite City, for appellee.

PRESIDING JUSTICE JONES delivered the opinion of the court:

The plaintiff, John Paul Kelley, Jr., brought suit in strict liability in tort against the defendant, American Motors Corporation, alleging that a 1972 Hornet automobile manufactured by the defendant was unreasonably dangerous as a result of certain deficiencies in its fuel system. The plaintiff suffered serious burns, principally to his face and head, following a collision that occurred on March 25, 1978. At trial, conducted during the latter part of March and the early part of April of 1982, a jury awarded the plaintiff $500,000. The trial court denied the defendant's post-trial motion, and the defendant has appealed, presenting several issues for review:

"1. Whether accident reconstruction offered by AMC is admissible.

2. Whether it is proper to permit plaintiff to question AMC's expert witness regarding a prior specific act which is unrelated to any issue in this case.

3. Whether the trial court should have quashed plaintiff's requests to produce documents and witnesses at trial.

4. Whether the jury was improperly instructed on the inferences permissible from a party's failure to call a witness under his control (I.P.I. No. 5.01).

5. Whether photographs of plaintiff taken during reconstructive surgery are admissible.

6. Whether evidence of AMC crash tests and proposed federal motor vehicle safety standards is admissible.

7. Whether the jury was improperly instructed on the issue of compliance with safety standards."

With respect to the first issue the defendant raises, that is, whether it was error for the trial court to exclude reconstruction testimony of the defendant's expert witness, Derwyn Severy, it is necessary to consider not only the defendant's offer of proof concerning reconstruction of the accident but also certain testimony of this witness and others, including the expert called by the plaintiff as well as the only eyewitness to the accident to testify.

Other eyewitnesses were unable to be reached, apparently, by either party, and the plaintiff has been unable since the collision to recall anything about it. Testifying for the plaintiff, the eyewitness, James Johnson, stated that just before the collision occurred on Sand Prairie Lane in Collinsville, a Ford Torino passed him. Shortly thereafter the Hornet, driven by the plaintiff, likewise passed the witness, who said that there "wasn't enough room" between the Torino and the car the witness was driving for the Hornet to reenter the lane between them. As a consequence, the driver of the Hornet attempted, at a rate of about 45 miles per hour, to pass the Torino. The road was damp and somewhat slick. The witness testified that as the Hornet attempted to reenter the lane ahead of the Torino, "[t]he Torino car sped up and hit the car in the back quarter panel by the bumper." According to the witness, the Hornet then struck a bridge abutment. The witness stated that he had seen sparks at the right rear quarter panel of the Hornet when the Torino struck it. He seemed later, however, to indicate that such sparks had not occurred until the Hornet had struck the abutment, though he seemed also to suggest that the two occurrences were virtually simultaneous. The Hornet then, he said, "spun around like it was coming back towards my car." Having flipped upside down, shortly thereafter the Hornet was on fire, with gasoline on the ground. The Hornet and the Torino came to rest about 15 feet apart. With the aid of a passerby the witness was able, with difficulty, to open the door of the Hornet and to remove the plaintiff, whose head was afire. The witness described the plaintiff as having "gasoline all over him." The witness stated further that the Torino

had struck the Hornet "[o]ne time," that the two cars had not touched again, that "first the back side [of the Hornet] was burning," and that the fire, growing larger, moved to the front of the vehicle. He said that an explosion occurred after the plaintiff was removed from the car. A young woman who was a passenger in the Hornet at the time of the collision had been thrown from the Hornet and run over by the Torino. In the attempts of the witness and the bystander to free the young woman from beneath the Torino the witness noticed that the front bumper of the Torino was "warm," "kind of hot." He had not, he said, at any time seen any fire coming from the Torino. The witness stated that the fire department arrived approximately 45 minutes after the collision occurred, at which time the Hornet was "totally burned." Indicating that he had looked over the Hornet at the scene of the accident, the witness said further, "I had taken a look at the car and seen the—what amazed me was the gas tank on it, it seemed like it just split open," the seams on the tank having "split." He testified that the gas tank was visible to him while the car was upside down, and described the location of the tank as "on the quarter panel and where the bumper is, where the Torino hit the car." He testified further that one of the two straps, apparently metal, around the tank had broken.

On cross-examination the witness stated that he could see "a foot or so in front of the bumper" on the passenger side of the Hornet as it attempted to reenter the lane in front of the Torino. He said that the impact was "right on the quarter panel" of the Hornet and that the fire "seemed to start at the back of the car." However, the witness admitted that in a deposition dated February 12, 1979, he had stated that the fire had started in the front of the Hornet. In the same statement the witness had said that he "didn't pay any attention to the gas tank" and that he had "no knowledge about its condition." On redirect examination the witness stated, "I believe that when the Ford hit the Hornet car that it busted the gas tank." He said that he had seen the tank in the "busted condition." Of the course of the fire he stated, "Well, the way I remember there was just gas everywhere and I believe that the gas just traveled up the car to the front." The plaintiff's testimony indicated that the Torino and the Hornet had departed from the home of the young woman riding with the plaintiff and were at the time of the collision on the way to a common destination.

The plaintiff called as an expert Dr. Robert Brenner, an engineer from Rockville, Maryland. He testified that the fuel tank in the 1972 Hornet is strapped under the floor of the trunk of the automobile,

with the filler pipe to the tank extending through the luggage compartment to the center of the rear of the vehicle. As part of the hypothetical question asked of this witness, he was asked to assume that the eyewitness had stated that the left front of the Torino had struck the passenger side of the Hornet near the back and that, as a result of the collision, the Hornet had gone out of control and had struck a concrete bridge abutment. He was also asked to assume, among other things, that the flames had begun at the rear of the vehicle and had moved forward. The witness expressed the opinion that the plaintiff's injuries were "the result of an unreasonably dangerous design in the Hornet."

He was of the further opinion that the discoloration of the paint at the front of the Torino, as shown in a photograph of the vehicle, was

> "precisely what is caused by gasoline. Gasoline that has been ignited.
>
> The accident, the crash took place at night, the headlights were on. The impact starts off on the right rear quarter panel, left side of the vehicle. The things happen to where the right side of the Torino takes the heavy bump after the initial impact, which produces the defamation [*sic*] of the bumper."

He explained that the damage to the right front of the Torino, which was greater than that sustained by the left front of the car, had been caused by the movement of the Torino and the Hornet during the collision. The witness continued:

> "Again, the question pertains to an explanation of the discoloration and again, interpreting the discoloration on the right front corner of the vehicle along with the discoloration in patches on top of the hood, is completely consistent. This is precisely what happens when gasoline strikes metal.
>
> Now, the gasoline is now exposed to a headlight. The headlight, however, is broken. That means that there are electrical wires that are exposed. So now we have the fuel, and we have the source of ignition, which is the broken wires in the headlight, to ignite the gasoline to produce the *** discoloration which is typical of gasoline burning on paint. The—But, again, typically if the gasoline isn't all over the vehicle then the fire goes out ***."

The witness added, "[T]here is simply no doubt in my mind that we have fire in the right front corner of the Torino, there's simply, in my opinion, no other way that this kind of discoloration, which is the signature of the gasoline burning on metal, so that it could be ex-

plained." The source of the gasoline, according to the witness, was the gas tank of the Hornet. Explaining a photograph of the Hornet as viewed from the back, the witness testified concerning the vehicle:

"Here we see the center mounted rear filler pipe area of the vehicle. We see the major burn patterns. Again, the same type of discoloration ***."

He continued:

"[W]e have the discoloration which, again, I firmly believe that this is gasoline burning on paint.

We see same, again, type of discoloration which is fire produced.

However, the testimony from the hypothetical states that there really isn't any kind of massive fire on the Hornet until after it has rolled over and the young man is trapped inside. So this fire had to occur after this fire had occurred and gone out.

Furthermore, the opinion that this had to be related to the fire relates to the other aspect of the hypothetical, which is that the eyewitness, when he went over to the Torino to get it up off the girl, found this area hot. The fire has gone out, there's no reason on a cold night for this area to be hot unless there had been fire.

So, again, we have a situation which again confirms my opinion that we have a fire at the Torino, it goes out, leaving the vehicle still hot in that area. The Hornet keeps on going, it turns over, then we have the massive fire. So this damage and as a matter of fact all of the massive damage to this Hornet happens after the fuel system has failed. So that in crash survivability we talk about the survivability of two factors. The survivability of the people in this car and the survivability of the fuel tank. What we have here is the fuel system has failed to survive the impact by the Torino, it has already let go. The entire incident is over. We find that the young man has survived the crash-producing forces under the hypothetical, but since the fuel system has failed to survive now he's subjected to this danger of the very serious burns.

The answer to the question then is, and we see massive damage to the Hornet. We see burn, massive fire damage which is similar in coloration to the fire damage on the Torino. However, the massive fire damage to the Hornet and the massive metal damage to the Hornet has nothing to do with the fact that we have the fuel system having failed. The fuel system has failed before all this happens."

The witness testified that the Hornet, like other motor vehicles produced by the defendant and some other automobile manufacturers, has a "unitized" body, instead of a frame, and that the unitized body, which offers certain advantages in terms of weight and expense, is, however, "bad from the stand point of rear-end impact" because of little or no "structure" to protect against impact from the rear. He stated that "from a design standpoint" this "major disadvantage" of unitized construction can be avoided by placement of the gas tank over the rear axle and, thus, out of the "crush zone of the trunk area." The axle itself, he said, provides some structural protection for the fuel tank. The witness described this design as "an important, extremely important safety design whether or not it is unitized or frame-type construction. Frame-type construction is going to have structure back here, a lot more structure. This design approach is important in the frame-type unit, and it is even more important in the unitized area." The witness expressed the opinion that

> "with the fuel tank located over the axle area the triggering fire which produced the damage to the Torino never would have occurred.
>
> And because of the evidence with regard to the performance of the fuel tank over the axle I just don't think there would have been a fire there and certainly not a fire of the massive magnitude that occurred here with the young man doused with gasoline and what have you. It just wouldn't have happened in my opinion."

This witness gave all of the foregoing upon direct examination.

The defendant called as an expert Derwyn Severy, an engineer from El Segundo, California. The witness, asked to assume, among other things, an impact between "the left front corner of the Torino and the right rear quarter panel of the Hornet," was of the opinion that the impact did not compromise the gas tank of the Hornet because "[t]here's no way in the world that type of contact is going to in any way involve the fuel system of the Hornet." The witness was of the further opinion that a photograph of the front of the Torino, plaintiff's exhibit No. 5, did not show any evidence of a gasoline fire to the Torino because of the absence of carbonaceous material, which is created when gasoline burns, on the surface of the Torino, including the surfaces of the chrome bumper. The witness stated:

> "I have examined this very carefully to try to find where the smoke or fire could have been and I find absolutely no evidence of any fire having been on or about this Torino. It may have been in what we call proximity heating condition where it's

near enough to the Hornet that as the Hornet is subsequently burning, it will come up on its temperature as a consequence of radiation, but not as a consequence of direct contact."

In the opinion of the witness the portions of the front of the Torino that appear to be rusty were damaged by "disfiguration to the surface," that is, crumpling of the metal, rather than fire, as the plaintiff's expert had maintained. The witness expressed the opinion that such damage to the front of an automobile as occurred to the front of the Hornet "would likely compromise the fuel system [of the vehicle] at the front" and that, assuming the damage that occurred to the Hornet, an over-the-axle gas tank would have been compromised and would have leaked. He was of the further opinion that the design of the fuel system of the 1972 Hornet was not unreasonably dangerous for the reason, among others, that

"[t]he cumulative impacts add up to an extremely severe collision damage condition and so we, I believe, would find that the front engine area fuel line system was disrupted, probably at the flex line that leads to the fuel pump. *** [I]f that hose [flex line] were to be separated at that point then the fuel can continue to ciphen [sic] out of that point and supply any flame."

The witness also expressed the opinion that the "combination of the fuel system and the unit body construction does not render this total design unreasonably dangerous, as a matter of fact it's a safe or conservative design based on the tests I have done in the past years."

Upon the trial court's sustaining of the plaintiff's objection to a reconstruction of the accident by this witness, the defendant made an offer of proof as follows. The witness stated that the Torino did not hit the Hornet until *after* the front and left side of the Hornet had struck the bridge abutment and the Hornet had rebounded into the lane in which the Torino was traveling, having flipped over so that it was lying on its "top and left side" at an angle of about 45 degrees at the time the front of the Torino struck the back of the Hornet. The witness referred to defendant's exhibits Nos. 16 through 20, which were not admitted into evidence and, hence, are not a part of the record for review. Some of these exhibits, however, incorporated photographs that were admitted as plaintiff's exhibits and are included in the record on appeal. The witness stated that certain "embossments" on the left rear quarter panel of the Hornet correspond to the shape and the dimensions of certain of the bridge railings. These embossments are visible in plaintiff's exhibit No. 3, a photograph of the back and the left side of the Hornet, which photograph is included in the record for review. In striking the bridge abutment, the Hornet suf-

fered damage so severe that its front end was almost completely torn away from the rest of the car. According to the witness, the "disrupted" front end would have provided a source of fuel for a fire. The source of ignition for such a fire, he said, would have been sparks resulting from the contact of metal with either the concrete bridge abutment or the surface of the road as the Hornet slid on its top and left side. The witness stated:

> "Now, when it got onto its top it was rearended and it wasn't on the full top, actually the top and left side. Rearended by the Torino and we can see by holding up the [defendant's] Exhibit 16 and looking at also Defendant's Exhibit 17 that there is a crease that is very prominent to the back of the lower photograph of Exhibit 17, which correlates with in evidence Exhibit 3 and that deep [nearly vertical] crease is [from] the front bumper of the Torino crushing into the rear luggage cover and rear bumper of the '72 Hornet. And that there is a corresponding embossment of the Hornet's bumper across the hood and bumper of the Torino. And when you fit those vehicles into that relationship it turns out that the Hornet is resting on its top and side as a consequence of the distortions [to the top and side] that have been produced primarily by the bridge contact, but partly by the rolling over onto its top \*\*\*."

The witness estimated that the Hornet was traveling at about 55 miles per hour when it struck the bridge abutment and at about five to 10 miles per hour when it was struck by the Torino, whose speed he estimated at about 35 to 45 miles per hour.

The witness continued:

> "The thing that I wish to point out, as cars pass each other I have studied this in a prospective [sic] of what a person can see. As cars pass and you're a driver, if you line yourself up where you're in the driving position on a highway without going out into the passing lane then as you're watching the car ahead, what you see is a big rearend, you don't see the sides of the car ahead. So when the car, the Hornet, is passed by the Torino or I will put it this way, when the Torino was passed by the Hornet and speeded up what the person behind can see is the rearend of both cars. They can also see that the vehicle that is cutting in on the pass, that's the Hornet, is cutting in a relationship quite close to the car, quite close or maybe in a relationship that looks like there is going to be a contact, impossible to see that interface or to judge exactly how close in a longitudinal mode. \*\*\* [I]t's reasonable to assume a contact

might have been made. But Johnson never said he saw the Torino wiggle from the contact. \*\*\* What I'm saying, if you hook the front you're going to cause movements on the Torino that should have been evident but weren't described. Maybe he just didn't notice that. I'm not saying it didn't occur, I'm saying you have to hang loose on that one, either contact occurred between them or it appeared to have occurred between them."

The witness expressed the opinion that because of the weight of the Torino (over 4,000 pounds) and its rate of speed (over 20 miles per hour) the kind of rear-end collision involved in this accident was different from those for which the 1972 Hornet would have been tested for any proposed standards. In ruling upon the defendant's offer of proof the trial court stated, "The Court, of course, accepts the offer of proof, but sustains the objection thereto. I think it's a brilliant piece of deduction by the expert witness and—but I think that the law requires that the eyeball or the person who saw the incident precludes that type of reconstruction."

In rebuttal, the plaintiff called as a witness Billy Joe Hayes, whom the defendant had called as a witness earlier. A member of the State Park Volunteer Department, the witness had responded to the call on the evening of the collision and had returned to the scene the next morning to help remove the wreckage of the Hornet from the side of the highway, where it had been placed temporarily following the accident. The witness testified that in order to prepare the Hornet for towing he had had to cut the gas line as well as part of the frame with a cutting torch. He stated that the gas line was still in contact with the motor, which he described as "still hanging on the right part of the frame where it was attached to the frame so I had to cut about maybe four inches of the frame."

In its brief, the defendant does not suggest that the excluded testimony of its expert witness was not reconstruction evidence but, instead, characterizes portions of the testimony of the plaintiff's expert as, likewise, reconstruction evidence. From this premise the defendant argues that it was

"patently unfair to permit plaintiff to utilize reconstruction testimony to support his theory of the case but to refuse to permit defendant to offer reconstruction testimony in support of an alternative theory. Had the court admitted Mr. Severy's reconstruction testimony, the jury would then have been free to choose which theory it believed. However, such a choice was not presented to the jury, since it did not have the opportunity to hear Mr. Severy's reconstruction."

In response the plaintiff discusses the rules concerning the admission of reconstruction evidence, arguing that the trial court was well within the scope of its discretion in prohibiting the reconstruction testimony proffered in the offer of proof, and urges that inasmuch as there was "clear and accurate eyewitness testimony" and "physical facts from which the jurors could determine what happened with reference to the collision," reconstruction testimony of an expert was not necessary for the jury to understand the facts of the case. The plaintiff maintains, further, not only that the testimony of his expert witness did not constitute reconstruction testimony as it is defined in the case law but also that, in fact, the defendant's expert "*did* give ample testimony on this point."

Despite the plaintiff's characterization of the testimony of Dr. Brennan as merely "his *opinion* that fuel from the Hornet's tank was splashed onto the Torino's bumper at the time of the initial impact and was ignited by exposed electrical connections from a broken front headlight," we are able to make no distinction in this regard between the testimony of the plaintiff's expert and that which the defendant's expert would have given had he had the opportunity to do so. The conclusion is inescapable that the character of the testimony of both experts is one and the same.

■■ ■ Whether to admit evidence of reconstruction is within the discretion of the trial court, and the court's determination is not to be disturbed on appeal in the absence of an abuse of that discretion. (*Diefenbach v. Pickett* (1969), 111 Ill. App. 2d 80, 248 N.E.2d 840.) Under the circumstances presented here, we conclude that it was an abuse of the trial court's discretion, after the plaintiff had put on reconstruction evidence favorable to its case, to prohibit the defendant from putting on similar evidence by way of defense.

Both parties discuss the effect that the testimony of an eyewitness may have upon the need for the testimony of an expert concerning reconstruction. In *Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 359, 392 N.E.2d 1, 3, the court addressed the matter, saying:

> "Because of a preference for eyewitness testimony, prior holdings have placed restrictions on the admissibility of reconstruction testimony. In *Plank v. Holman* (1970), 46 Ill. 2d 465, 471, the court held that reconstruction testimony 'may be used in addition to eyewitness testimony' if it is determined that 'it is necessary to rely on knowledge and application of principles of science beyond the ken of the average juror.' Two years later, in *McGrath v. Rohde* (1972), 53 Ill. 2d 56, 61, the court again

held that it is not proper to supplement eyewitness testimony with reconstruction testimony if the factual matters to be resolved do 'not require a scientific knowledge beyond that of typical jurors.' "

Whether the factual matters to be resolved here required a scientific knowledge beyond that of typical jurors—and that we do not decide—the plaintiff chose, through portions of the testimony of the expert whom he called, to put on evidence that is indistinguishable in kind from that which he prevented the defendant from introducing, evidence that both the plaintiff and the defendant deem to be reconstruction evidence. For the trial court to permit one party to introduce such evidence but to preclude the other from doing so was simply unfair.

In making its ruling the trial court relied, in part, on *Albee v. Emrath* (1977), 53 Ill. App. 3d 910, 369 N.E.2d 62, in which the court on review stated that, though eyewitness testimony lessens the need for a reconstruction expert, such a witness may be allowed to testify when the testimony of an eyewitness is unclear or unconvincing. The plaintiff's description of James Johnson's testimony notwithstanding, the testimony of the eyewitness in the case at bar was singularly unconvincing concerning matters crucial to the imposition of liability. The credibility of the eyewitness was badly shaken by his prior inconsistent statements about the initial location of the fire in the Hornet and the rupture of its gas tank. The testimony of the plaintiff's expert helped to shore up—surely it did not diminish—the flagging credibility of the eyewitness, in part, because the theory espoused by this expert accorded with the account upon which the eyewitness ultimately settled and, in part, because no countervailing theory was admitted into evidence. Each party called a single expert witness of roughly comparable credentials and relied heavily upon the testimony of his own expert. Had the defendant's expert been able to testify as indicated in the offer of proof, since his theory was in accord with the contrary statements of the eyewitness that were decidedly unfavorable to the plaintiff's position, the jury might have reached a different conclusion.

Although the plaintiff asserts the amplitude of the testimony of the defendant's expert that was admitted into evidence with regard to matters of reconstruction, the record does not admit of so generous a reading. Though the defendant's expert was able to express the view that the fuel line system to the "front engine area" was disrupted so as to be able to supply a flame, he was not permitted to present the reasoning in support of his view. As a result, his opinion, which bore

upon the origin of the fire, was deprived of plausibility. At no time, other than in the offer of proof, was the defendant's expert able to suggest that the Torino did not strike the Hornet until after the engine of the latter vehicle had been severely damaged by the collision with the abutment. However, the initial collision between the right rear quarter panel of the Hornet and the front of the Torino, and the ensuing fire, was of critical importance to the plaintiff's claim that the fuel system of the Hornet was unreasonably dangerous, inasmuch as the claim rested largely on the allegedly faulty location of the gas tank of the Hornet near the rear bumper instead of over the axle.

Thus, the exclusion of the testimony of the defendant's expert, as set forth in the offer of proof, was highly prejudicial to the defendant and constituted reversible error. Accordingly, we reverse the judgment of the trial court entered on the verdict of the jury and remand the cause for a new trial. It goes without saying that, upon retrial, it will be discretionary with the court whether to allow the use of or to admit into evidence the exhibits of the defendant that accompanied the offer of proof, assuming that the defendant should wish to use or to offer them.

Having considered the dispositive issue in this case, for purposes of guidance we turn to a consideration of those issues that might arise upon retrial. With respect to the second issue the defendant raises, that is, the questioning of the defendant's expert during cross-examination about a prior act of misconduct, the record shows that plaintiff's counsel asked the following question concerning another case in which the witness had been a consultant: "Did a problem arise in that case about some—your testing of some of the—this Ford at that time and whether or not you had tampered with the—in the testing process of that car?" Upon the defendant's hearsay objection and motion for mistrial counsel for plaintiff in an offer of proof stated that the plaintiff's attorney in the case in question, Segar v. Aufenberg Lincoln-Mercury and Ford Motor Co., had "told me he talked with the mechanic who called him later and said this man did it and told him he saw him do it." Counsel for plaintiff in the case at bar described the indications of tampering as "marks of either a screwdriver or some kind of wrench or something on the vehicle." Apparently counsel for the defendant in the instant case, Mr. Churchill, was one of the defense attorneys in Segar, and Derwyn Severy seems to have examined the vehicle in question there for the defendant but did not testify. During discussion of the defendant's objection and motion in the case at bar, Mr. Churchill stated that he did not deny that there were marks on the car but denied that Mr. Severy "had anything to

do with it." The trial court overruled the objection and denied the motion for mistrial.

■ The plaintiff cites *People v. Kirwan* (1981), 96 Ill. App. 3d 121, 421 N.E.2d 317, in which counsel had attempted to impeach a witness by making known to the jury the witness' commission of perjury in another case. The witness had not been charged with or convicted of the crime of perjury. The court in *Kirwan* noted the difference of opinion among authorities concerning the admissibility of such impeachment:

> "According to one authority on Illinois evidence law, impeachment of a witness with evidence of prior acts of misconduct not leading to a conviction is expressly prohibited. (E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 608.5 (3d ed. 1979).) 'Inquiry with respect to specific acts of misconduct is barred on the ground that such examination is regarded as overly prejudicial in relation to its probative value.' (E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 608.5 at 282 (3d ed. 1979).) Other authorities indicate, however, that such evidence is admissible subject to the discretionary control of the court. (S. Gard, Illinois Evidence Manual Rule 22:12 (2d ed. 1979); McCormick, Handbook on the Law of Evidence sec. 42 (2d ed. 1972).)" (96 Ill. App. 3d 121, 126, 421 N.E.2d 317, 321.)

The court in *Kirwan* concluded that "[a]lthough the complete prohibition of such evidence may be the preferred rule (see McCormick), applying the abuse of discretion standard we do not believe the lower court committed reversible error in ruling that the evidence relating to [the witness'] prior perjury was not to be heard by the jury." 96 Ill. App. 3d 121, 126, 421 N.E.2d 317, 321.

In the case at bar, neither party has suggested that the nature of the misconduct complained of differs from that addressed in *Kirwan* and the authorities cited therein. Although *Kirwan* might authorize such impeachment in some cases, in the instant case the evidence tendered by way of the offer of proof was so slight and so tenuous that it is unreliable as an attack upon the credibility of this witness. Hence, any probative value it might have is substantially outweighed by the danger of prejudice. We note that there is nothing in the record to suggest and the plaintiff has made no assertion that the defendant's expert acted improperly in any way in the case at bar.

Citing *United States v. Terry* (2d Cir. 1983), 702 F.2d 299, 316, *cert. denied* (1983), 461 U.S. 931, 77 L. Ed. 2d 304, 103 S. Ct. 2095, the plaintiff maintains that "[t]here is no doubt that this question

[asked on cross-examination] would be proper under the federal rule."
In *Terry*, on cross-examination, the prosecutor had questioned a
"voice expert" about prior cases in which his testimony had been crit-
icized by the court as unworthy of belief. A judge before whom the
witness had testified as an expert had found that the witness had
"guessed under oath." Proof that the judge had so found was to the
court "probative of the weight to be accorded to his testimony" (702
F.2d 299, 316). The evidence upon which the impeachment was based
in the instant case was remarkably less reliable than that in *Terry*,
whose facts, we think, not only distinguish it from the case at bar but
underline the inadequacy of the evidence tendered here.

■ The defendant asserts that the trial court abused its discre-
tion in giving plaintiff's instruction No. 7, which is based upon Illinois
Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971), concerning
the inference that may be drawn by a party's failure to produce a wit-
ness within his power to produce. The plaintiff maintained that the in-
struction was warranted because of the defendant's failure to call any
of its employees involved in the design of the unitized construction
and the fuel system of the 1972 Hornet, saying:

> "They have got 10,000 employees or whatever number, they
> never brought a single employee into this courtroom who was
> an engineer designer or else to say we had a good fuel system.
> There hasn't—numerous people's names were given here, Seidl
> [one of defendant's employees, a mechanical engineer, called by
> plaintiff as an adverse witness] mentioned several of them.
> Some other [Mr.] Turtle, [Mr.] Nemeth various other people
> were involved in the fuel system of this automobile, knew its
> design and so forth. None of those people were brought here.
> They brought one guy in here to testify to that and that was
> the [*sic*] Severy."

Under the plaintiff's approach, the defendant would have to parade
before the jury all of its employees who are knowledgeable about
these matters in order to forestall the giving of this instruction. To
allow the instruction under the circumstances is to work undue preju-
dice upon the defendant. This is so quite apart from any consideration
of the defendant's making its employees available to the plaintiff as
witnesses pursuant to Supreme Court Rule 237 (87 Ill. 2d R. 237). See
*Feigl v. Terminal Railroad Association* (1975), 30 Ill. App. 3d 55, 332
N.E.2d 416.

■■ The defendant contends that the trial court erred in admit-
ting 44 photographs of the plaintiff taken by his physicians during the
course of his treatment. It is well settled that a photograph should be

excluded when it is irrelevant or immaterial or its prejudicial nature plainly outweighs its probative value. (*Rusher v. Smith* (1979), 70 Ill. App. 3d 889, 388 N.E.2d 906.) The admission and use of such evidence is within the sound discretion of the trial court. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.) In the case at bar, although the photographs in question are unquestionably gruesome, their probative value outweighs any prejudice they might occasion. In the case of the plaintiff's exhibits Nos. 13 through 43, the testimony of the plastic surgeon, Dr. Richard Halford, would not have been fully understandable without the aid of these photographs. Similarly, the other photographs of plaintiff included in the record on review as plaintiff's group exhibit No. 53 and exhibit No. 54 are illustrative of the course of the plaintiff's progress and treatment by Dr. Monafo during the first eight months after his injury prior to Dr. Halford's treatment of him.

We turn to the issue defendant raises concerning the admission of evidence of both a crash test it had conducted in July of 1971, called Crash Test 508, and proposed Federal safety standards. The decision whether to admit evidence of experiments rests largely in the sound discretion of the trial court. (*Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 404 N.E.2d 311.) However, it is well established that reconstruction experiments are incompetent unless the essential elements of the experiment are shown to be substantially similar to those existing at the time of the accident. (*Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 404 N.E.2d 311.) On retrial there must be a "foundational showing of substantial similarity between the tests conducted and actual conditions." (*Rockett v. Chevrolet Motor Division* (1975), 31 Ill. App. 3d 217, 225, 334 N.E.2d 764, 771.) We note the difficulties that will arise in establishing substantial similarity between Crash Test 508 and the actual conditions of the accident because of, among other things, the differences in the size and weight of the 1971 Ambassador automobile used in the test and the 1972 Hornet in which the plaintiff was injured. In the Ambassador the gas tank had been placed over the axle. The test vehicle lacked a filler spout and gas cap. In the test, the vehicle was moving backward at a speed of 31 miles per hour into a fixed barrier, and the entire rear end of the vehicle apparently struck the barrier.

Crash Test 508 was described at trial by plaintiff's expert as having been undertaken by defendant to determine the feasibility of complying with a proposed safety regulation concerning fuel system integrity. The proposed regulation, referred to as Docket 70-20, involved a

rear end impact with a fixed barrier at 30 miles per hour. This proposed standard, more stringent than the existing standard, which was also in evidence at trial, was never adopted. The defendant asserts that because the proposed standard was never adopted it is inapplicable to the Hornet and, hence, irrelevant. The plaintiff, in support of the admissibility of this proposed standard, relies upon the cases, among others, of *Seward v. Griffin* (1983), 116 Ill. App. 3d 749, 452 N.E.2d 558, and *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809. In *Seward*, certain Federal motor vehicle safety standards were held admissible, although some of them were not applicable to the 1970 Volkswagen van in question until a later date. In *Merchants National Bank* the court held admissible standards for grade-crossing protection of public highways in Illinois that had been set by the Department of Public Works and Buildings. These standards were not, however, binding upon the defendant railway because the Illinois Commerce Commission had not adopted them. In contrast to these two cases, however, is the case at bar, in which the proposed standard was not adopted at any time by any agency. We fail to see its relevance to the 1972 Hornet. Hence, on retrial evidence of the proposed standard ought not to be admitted.

■ The defendant objects to the trial court's having given Plaintiff's Instruction No. 18, which stated:

> "The compliance by a party with a federal standard is not a defense to this action but may be considered by you along with all the other evidence herein in determining the question of whether the vehicle in question was or was not unreasonably dangerous when it left the defendant's control."

If upon retrial a similar instruction is tendered, it should conform to the following expression of the court in *Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 305, 443 N.E.2d 575, 578, discussing *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534:

> "The decision in *Rucker* expressly announced that safety-standard evidence is not conclusive on the issues for which it may be presented. 'The finder of fact may conclude that a product is in an unreasonably dangerous defective condition notwithstanding its conformity to Federal standards' [*Rucker*], and the jury may be so cautioned."

*Rucker* held that evidence of a product's compliance with governmental safety standards is relevant and admissible in a product liability case on the issues of whether the product is defective and whether a defect in the product is unreasonably dangerous. In determining

whether to give such an instruction, the trial court should on retrial bear in mind the caution of the court in *Moehle* that

> "in instructing the jury the trial judge may avoid unnecessary highlighting of safety-standard evidence by following the approach of the trial judge in this case, who refused to submit Chrysler's proposed instruction on safety-standard evidence to the jury, presumably on the ground that it would have unnecessarily over-emphasized the importance of that evidence." 93 Ill. 2d 299, 305, 443 N.E.2d 575, 578.

We note that in their briefs both parties appear to quote from an earlier opinion of *Dugan v. Sears, Roebuck & Co.* (1983), 113 Ill. App. 3d 740, 447 N.E.2d 1055. According to the footnote on the first page of the opinion printed in the hardbound volume of the Official Reports, the subsequent opinion was filed after rehearing was allowed and replaced the earlier opinion, which appeared in the May 18, 1983, advance sheet at the same page. The hardbound volume of the unofficial reports appears to contain the earlier opinion.

Reversed and remanded.

KASSERMAN, J., concurs.

JUSTICE WELCH, dissenting:

I would affirm the judgment of the circuit court of Madison County. Therefore, I respectfully dissent.

The general rule regarding reconstruction testimony is that it may not be used as a substitute or supplement for eyewitness testimony where the latter testimony is available unless it is necessary to rely on knowledge and application of principles of physics, beyond the ken of the typical juror. (*McGrath v. Rohde* (1972), 53 Ill. 2d 56, 61-62, 289 N.E.2d 619, 622-23; *Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 359, 392 N.E.2d 1, 3.) Where eyewitness testimony is available, use of experts is left to the discretion of the trial court, with the guiding principle that the use of such testimony should be the exception rather than the rule. (*People v. Dietschweiler* (1974), 21 Ill. App. 3d 707, 714-15, 315 N.E.2d 585, 592.) The appellate court should not find error or set aside a ruling of the trial court based on a discretionary matter unless there has been a clear abuse of discretion. (*People ex rel. Illinois State Dental Society v. Norris* (1979), 79 Ill. App. 3d 890, 900-01, 398 N.E.2d 1163, 1172.) In the case at bar, the trial court's rejection of offered reconstruction testimony is in accord with the general rule, and I do not view this case as so obviously re-

quiring a contrary result as to justify reversal.

The majority of the court in this cause appears to have been most strongly convinced in favor of the AMC's position by the fact that plaintiff's expert offered a reconstruction opinion regarding the accident, whereas AMC's expert was prevented from doing so. Thus, the majority does not address the issue of whether the fact issues at trial required scientific knowledge beyond that of typical jurors. I believe that there was sufficient eyewitness description of the contact between the Torino and the Hornet, and between the bridge abutment and the Hornet, that neither party was entitled to present an accident reconstruction to the jury. (See *McGrath v. Rohde* (1972), 53 Ill. 2d 56, 289 N.E.2d 619, which involved facts no more complex than the instant facts, yet reconstruction testimony was held properly refused.) The trial court cannot have abused his discretion in permitting plaintiff's expert to testify as he did, since the record does not indicate that AMC provided the court an opportunity to exercise his discretion by objecting thereto. Given such opportunity by plaintiff's objection to defendant's expert's testimony, the trial court in my opinion exercised his discretion correctly.

On the preceding points the majority and I do not disagree, as the majority does not decide whether the instant eyewitness testimony sufficed to preclude reconstruction testimony. Rather, the majority is concerned that one party was permitted to introduce reconstruction evidence and the other party was precluded from doing so. I believe this lack of symmetry was more apparent than real. In response to a hypothetical question by plaintiff's counsel based on the facts of the collisions as gleaned from Johnson's eyewitness testimony, plaintiff's expert testified at length concerning his theory that the described impact between the vehicles compromised the fuel tank of the Hornet, as shown by fire damage to the Torino. Defendant's expert testified before the jury that he found no evidence of fire damage to the Torino; that the contact between the Torino and the Hornet could not have involved the Hornet's fuel system; and that the damage to the front of the Hornet would have compromised the fuel system at the front of the vehicle. He was prevented from testifying that Johnson's eyewitness account that the Hornet had contacted the Torino before the bridge abutment was likely the reverse of what actually happened, based on the impact damage of the two vehicles, and that the Hornet was travelling 55 miles per hour when it struck the bridge abutment, whereas Johnson had testified that the Hornet's speed was about 45 miles per hour just prior to the accident. Thus, both experts testified before the jury regarding their opinions of the effect on the Hornet's

fuel system of the events described by the eyewitness, whereas defendant's expert was prevented from contradicting the eyewitness account, which contradiction plaintiff's expert had not attempted. In this context, I do not view the ruling complained of as having diminished the fairness of the trial.

Finally, AMC's reliance on the trial court's comments at the time of the ruling complained of is overstated. The trial court did not purport to state the entirety of the rule set forth by our supreme court regarding the admissibility of reconstruction testimony. Rather, the trial court's comment was directed solely to the most significant fact standing against admission of the offered reconstruction, *i.e.*, the nature of the foregoing eyewitness testimony. It is the judgment and not what else may have been said by the trial court that is on appeal; the judgment may be sustained upon any ground warranted, regardless of the reason given by the trial court. *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12.

Finding no other error justifying reversal, I would for the foregoing reasons affirm the judgment of the circuit court.