**UNITED STATES ex rel. Sherman HOWARD, Petitioner,**

v.

**George DeTELLA,[1] Respondent.**

**No. 94 C 1246.**

United States District Court, N.D. Illinois, Eastern Division.

March 18, 1997.

**1.** The State points out that Richard Gramley, the present warden having custody over Howard, is the proper respondent in this action. *See Hogan v. Hanks*, 97 F.3d 189, 190 (7th Cir.1996). This Court agrees. The Clerk is hereby directed to remove the name of George DeTella as respondent and substitute the name of Richard Gramley as the sole respondent on all future filings connected with this case.

Sherman Howard, Galesburg, IL, pro se.

Bradley P. Halloran, Paul James Chevlin, Illinois Attorney General's Office, Arleen C. Anderson, Attorney General's Office, Chicago, IL, for respondent.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Sherman Howard, an inmate in the Hill Correctional Center, petitions pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus setting aside his conviction under Illinois state law for aggravated sexual assault. In earlier proceedings in this case, this Court held that Howard's petition was procedurally defaulted because he had failed to raise his present constitutional claims to the Illinois

courts. Specifically, Howard neglected to file any brief with the Illinois appellate court in support of his appeal from the denial of his petition for post-conviction relief, and did not appear to have filed a petition for leave to appeal with the Illinois Supreme Court. *See United States ex rel. Howard v. Detella,* No. 94 C 1246, 1995 WL 417567 (N.D.Ill. July 12, 1995).

Howard appealed the dismissal of his habeas petition, and the Seventh Circuit reversed. The Seventh Circuit held that the Illinois appellate court's statement—that it found "no issues of arguable merit" after reviewing the record and the brief filed by Howard's appointed attorney seeking to withdraw—must be read as finding that the appeal raised no meritorious constitutional claims. *See Howard v. DeTella,* No. 95–3123, 1996 WL 405212 (7th Cir. July 16, 1996). The Seventh Circuit interpreted this statement as a decision on the merits of Howard's claims that avoided a procedural default. Therefore, this Court now addresses the merits of Howard's claim in accordance with the instructions of the Seventh Circuit.

## RELEVANT FACTS

▪ When considering a petition for habeas corpus, this Court ordinarily would look to the factual determinations made by the state court. *See Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). In this case, however, we are not aware of any Illinois court decision containing a statement of facts. Nor has Howard submitted any other statement of facts in connection with this petition.[2] Howard did, however, set forth facts in his brief in support of his petition for Illinois post-conviction relief, and also set forth his claims in more detail in his reply brief submitted in connection with his original habeas petition. The following facts are drawn from these briefs and from portions of the trial

**2.** Strictly speaking, Howard's petition is defective because it does not provide enough specific facts in support of his claim to enable a court to tell from the face of the petition whether further habeas review is warranted. *Adams v. Armontrout,* 897 F.2d 332, 334 (8th Cir.1990); *see also* RULES GOVERNING SECTION 2254 CASES IN THE UNITED

STATES DISTRICT COURTS 2(c), 4 (1996). Although this failure to provide sufficient factual detail can be fatal to a habeas corpus petition, the Court chooses instead to look to the factual details that Howard included in his petition for state post-conviction relief.

transcript, which were submitted as exhibits to the State's Answer. Resp.'s Answer to Pet'n, Exs. C—G. We also have examined the complete transcript of the testimony of Dr. Constance Blade–Schlessinger, submitted by Howard in response to a request by this Court.

On October 5, 1989, Sherman Howard was convicted of aggravated sexual assault for two instances of penetration of his young daughter, Tamika. He was sentenced to twenty years in prison. At trial, the evidence against Howard was given primarily by Tamika herself; Linda Fletcher, Tamika's aunt; and by Dr. Constance Blade–Schlessinger, a doctor who examined Tamika. Tamika, who was five and a half years old at the time of the final instance of sexual abuse and eight years old at the time of trial, testified with clarity that her father had sexually abused her over a period of years. Tamika testified that her father placed his finger in her vagina, asked her to lick his penis, and placed his penis in her vagina. She could only recall the date of the most recent instance of abuse, which occurred about the time that her younger sister was born (December 13, 1986). Tamika testified that she had told her mother, an addict and prostitute, about the abuse but that her mother scolded her and would not listen to her. Tamika also testified to disclosures she had made to her aunt.

Linda Fletcher, Tamika's aunt who cared for Tamika from time to time and eventually gained custody of Tamika, testified regarding Tamika's disclosures of the abuse to her, her own observations of Tamika's genital area during baths, and her attempts to have Tamika medically evaluated for signs of sexual abuse. Fletcher testified that between April 1982 and May 1983, Tamika was living in the same house with Fletcher, but Tamika's parents were living elsewhere. Howard would come and get Tamika occasionally for visitation. Tamika often returned home from these visits dirty and groggy or sleepy. After one such visit in May 1983, Tamika expressed pain while urinating. Upon ques-

tioning, Tamika told her aunt that her father had been "playing games" with her. Tamika explained that her father had turned some music on loud and asked her to run around and dance with her pants off. He then asked her to lie down and placed his finger in her vagina (which she called by another name) and had her lick his penis. Tamika also told Linda Fletcher that her father made her swallow pink and yellow pills from his dresser.

In October 1985, Tamika once again came to live with Fletcher, and reported that her father was engaging in oral sex with her and placing his penis into her vagina. (Tamika described these acts using childish nicknames, which she explained to her aunt.) Fletcher examined Tamika's genital area and observed redness, puffiness, and a discharge. Finally, Fletcher testified that in December 1986, Tamika again stayed with her around the time the Tamika's younger sister was born. Tamika again told Fletcher that Howard was engaging in oral sex and intercourse with her. Tamika returned to her mother's house after that, but was moved elsewhere by her mother. In February, 1987, Fletcher retrieved Tamika and began proceedings to obtain custody of Tamika.

Dr. Blade–Schlessinger was the third doctor to examine Tamika. Dr. Rosen examined Tamika in 1983, and Dr. Shettee examined her in June 1987. Both of these doctors noted that Tamika's hymen was not intact.[3] When Dr. Blade–Schlessinger examined Tamika in November, 1987, however, she found that there was no neovascularization, a sign of sexual contact, and that Tamika's hymen was intact. Dr. Blade–Schlessinger explained this discrepancy by testifying that a child's hymen can heal and "regenerate" over time. The record indicates that this testimony was based on medical literature with which Dr. Blade–Schlessinger was familiar, including a recent article in the monthly magazine *Pediatrics*, written by Martin Finkel and entitled "Anogenital Trauma in Sexually Abused Children." Howard's attorney cross-examined Dr. Blade–Schlessinger

---

**3.** Howard's trial counsel objected to the introduction of the records of the previous examinations as part of Dr. Blade–Schlessinger's expert testimony. The trial court overruled the objection, but gave a hearsay limiting instruction to the jury. R. 360–64.

on this "regeneration" opinion and on the article, showing that of the seven children discussed in the article, only one had hymenal disruption such as that noted in Tamika, and that child had later scarring. After hearing closing arguments, the jury returned a verdict of guilty.

Through counsel, Howard appealed his conviction. Howard says that he asked his appellate counsel to raise the following claims, laying the factual and legal basis for them out in detail: (1) the improper admission of confusing, prejudicial, and scientifically unsupported medical testimony regarding hymen regeneration by Dr. Blade–Schlessinger; (2) prosecutorial misconduct; and (3) improper evidentiary rulings by the trial court. Howard's counsel did not raise these arguments on appeal, however, instead arguing only that the indictment was insufficient. The appellate court found no merit to this argument and affirmed the conviction in an unpublished two-page order. *People v. Howard,* No. 1–89–3108, 226 Ill.App.3d 1107, 206 Ill.Dec. 826, 645 N.E.2d 1078 (Ill.App.Ct. Mar. 19, 1992) (attached as Ex. A to Resp.'s Answer to Pet'n). Howard then unsuccessfully petitioned the Illinois Supreme Court for leave to appeal.

Howard's post-conviction petition was also unsuccessful. In reviewing the circuit court's denial of the post-conviction petition, the Illinois appellate court stated, in another unpublished two-page order, that "We have carefully reviewed the record in this case and the aforementioned brief [of Howard's appointed appellate counsel, seeking to withdraw] in compliance with the mandate of *Pennsylvania v. Finley* [, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) ] and find no issues of arguable merit." *People v. Howard,* No. 1–93–0582, 247 Ill.App.3d 1102, 213 Ill.Dec. 653, 659 N.E.2d 999 (Ill.App.Ct. Aug. 5, 1993) (attached as Ex. B to Resp.'s Answer to Pet'n). The Illinois supreme court denied

How,rd's petition for leave to appeal the dismissal of his post-conviction petition.

Howard now brings this petition for habeas corpus relief. In it, he argues only that he was deprived of the effective assistance of counsel on his direct appeal, due to his appellate counsel's failure to raise the following arguments: (1) medical expert testimony not generally accepted in the field was improperly admitted; (2) there was an accumulation of prosecutorial misconduct and error involving references to prior criminal conduct and "kidnapping" by Howard; (3) the trial court's jury instructions failed to remedy the prosecution's incorrect definition of the reasonable doubt standard; and (4) hearsay evidence (Fletcher's reporting of Tamika's conversations with her was improperly admitted).

## LEGAL STANDARDS

■ A court will reach the merits of a petitioner's habeas claims only if he has exhausted his state remedies and avoided procedural default of those claims. *Lostutter v. Peters,* 50 F.3d 392, 394 (7th Cir.1995). Based upon the Seventh Circuit's decision in the appeal of this case, we conclude that the exhaustion and procedural default requirements have been met, and address only the merits of Howard's claim here.

Under the habeas corpus statute as recently amended, federal courts must deny a petition for habeas corpus with respect to any claim adjudicated on the merits in a state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996) (en banc) (recently amended version of § 2254 applies to cases such as this one), *cert. granted,* —— U.S. ——, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997).[4] In this case,

---

4. The Court is aware that the Supreme Court has granted certiorari to review the holding in *Lindh v. Murphy* that the newly amended version of § 2254(d) applies to pending habeas petitions. Therefore, although we believe that *Lindh v. Murphy* is good law, we have taken the precaution of analyzing Howard's claims under both the old and new versions of § 2254.

Although the new version of § 2254 is widely perceived as imposing a stricter standard of review on petitions for habeas corpus, the task of a federal court reviewing a habeas petition remains the same as before: to determine whether a state prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." *Lindh v. Murphy,* 96 F.3d at 886 (Rip-

the relevant Illinois appellate court's decision stated only that their review of the record and appellate counsel's *Finley* brief revealed "no issues of arguable merit." Our task thus is to consider whether Howard's claims do have any merit, under "clearly established Federal law, as determined by the Supreme Court of the United States."

## ANALYSIS

Howard claims that the failure of his appellate counsel to raise certain arguments deprived him of the effective assistance of counsel, in violation of the Sixth Amendment. The Seventh Circuit has held that "the performance of appellate counsel is assessed using the same standards applied to trial counsel under *Strickland v. Washington*," 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir.1996); *see also Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986). Those standards require a reversal only if the petitioner can meet a two-pronged test: first, he must show that his attorney's performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064; and second, he must demonstrate that the deficiency of his lawyer's performance prejudiced him to the point that the proceeding was "fundamentally unfair and the result unreliable." *Mason*, 97 F.3d at 893.

Where, as here, the petitioner's claim of ineffective assistance of appellate counsel concerns the failure to raise certain arguments on appeal,

the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.

*Gray v. Greer*, 800 F.2d at 646. The omission of "significant and obvious" issues without any strategic reason for the omission meets the first prong of *Strickland*, i.e., deficient performance. If the omitted arguments could have "resulted in a reversal of the conviction, or an order for a new trial," the second prong of *Strickland*—prejudice—has also been met. *Id.*; *see also Mason*, 97 F.3d at 893.

Howard claims that his appellate counsel should have raised four arguments: (1) the medical expert testimony regarding hymen regeneration was not scientifically supported; (2) prosecutorial comments regarding prior criminal conduct and "kidnapping" by Howard deprived Howard of a fair trial; (3) the court's instructions to the jury failed to correct the prosecutor's misstatement of the

ple, J., dissenting) (quoting § 2254). The recent amendments to § 2254 have tightened the focus of the legal analysis applied to habeas claims, by emphasizing that only the Supreme Court, not other federal courts, may define the boundaries of viable constitutional claims. *Id.* at 869, 871. There is some tension between the new statutory commandment to look only to Supreme Court law in defining constitutional rights, and the lower federal courts' obligation to apply that law to the particular cases before them. Judge Easterbrook, writing for the majority in *Lindh*, noted that the determination whether an appellate gloss on a decision of the Supreme Court has stayed within the bounds of Supreme Court jurisprudence or has exceeded them is a "potentially difficult task." *Id.* at 869. In a special concurrence, Judge Wood agreed, and noted that "that task will be ours in virtually every case that comes before us ...", because it is rare indeed that we will see something identical in all particulars to a case already decided by the Supreme Court." *Id.* at 878. Judge Wood went on to state her belief that federal courts "both can and must look for guidance in our own [appellate court] decisions, decisions from other appellate courts (federal and state), and persuasive secondary sources." *Id.* At that point, the difference between federal law "as determined by the Supreme Court of the United States" and plain old federal law becomes indistinct indeed.

In analyzing the constitutional claims raised by Howard's petition, we have applied Supreme Court precedent and its direct derivatives in reaching our conclusion that Howard's petition must be denied. However, we have also looked at the broader array of federal court decisions on the issues raised to see if any of them would justify overturning Howard's conviction. Our holding today is buttressed by our finding that even applying the older, broader definition of "federal law," nothing in that law requires the granting of Howard's petition for habeas corpus. In short, no matter which version of § 2254 is applied, Howard does not prevail.

reasonable doubt standard made in closing; and (4) hearsay testimony by Fletcher describing Tamika's reports of abuse to her should not have been admitted. After reviewing the record carefully, this Court finds that, while the failure to raise these issues arguably demonstrates a deficient performance by Howard's appellate counsel, Howard cannot show any prejudice from the failure to raise these issues.

The Court is well aware of the "strong presumption" that an attorney's assistance was effective within the meaning of the constitution. *See Mason,* 97 F.3d at 892 (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65). And, as noted below, there are several problems with the arguments that Howard asked his appellate counsel to make. Nevertheless, we believe that the better practice for appellate counsel is to raise all issues that their clients want raised, so long as those arguments are consistent with Federal Rule of Civil Procedure 11 and the dictates of legal strategy. Moreover, when we compare the issues that Howard wanted raised with the single issue that his appellate counsel did present, we conclude that at least some of Howard's issues had a better factual and legal basis than the issue that his counsel presented. We can discern no reason why Howard's attorney could not simply have added the issues Howard wanted raised to the single issue she already planned to present; if more time were needed, a motion for extension of time could easily have been made. Under the test of *Gray v. Greer,* then, the Court finds that the presumption of effective assistance of counsel has been overcome.

To be successful in his petition for habeas corpus, however, Howard still must demonstrate that his appellate counsel's deficiencies caused him real prejudice, in that without those deficiencies he would be entitled to the reversal of his conviction or a new trial. For the reasons discussed below, Howard cannot meet this second prong of the *Strickland* test.

*Scientific Testimony*

The first issue Howard contends his appellate attorney should have raised is the scientific validity of Dr. Blade–Schlessinger's testimony that a hymen can regenerate.[5] Unfortunately, Howard has not presented any evidence to support his argument that this testimony was improperly admitted.[6]

Moreover, this issue was not preserved for appellate review, because Howard's trial counsel did not object to the admission of this expert opinion. If the trial counsel does not object, the issue is waived on appeal. *See People v. Mahaffey,* 166 Ill.2d 1, 27, 209 Ill.Dec. 607, 619, 651 N.E.2d 1055, 1067 (failure to object contemporaneously to an expert's testimony waives issue on appeal unless it rises to the level of plain error), *cert. denied,* —— U.S. ——, 116 S.Ct. 547, 133 L.Ed.2d 450 (1995); *In re Marriage of Blinderman,* 283 Ill.App.3d 26, 31, 218 Ill.Dec. 544, 548, 669 N.E.2d 687, 691 (1st Dist.1996) ("Failure to object to an expert's qualifications results in a waiver on appeal.").

The record makes clear that, at least during Dr. Blade–Schlessinger's testimony at trial, the defense counsel did not object to the substance of her opinions. Instead, the record indicates that the defense cross-examined the doctor on those opinions. No less an authority than our Supreme Court has noted that the "traditional and appropriate"

5. Howard does not challenge Dr. Blade–Schlessinger's overall qualifications as an expert in child sexual abuse, only her testimony related to hymen regeneration.

6. The only source Howard refers to that even begins to suggest that Dr. Blade–Schlessinger's opinions on hymen regeneration were scientifically suspect or discredited is a single cite to *In re B.J.S.,* 151 Ill.App.3d 1023, 105 Ill.Dec. 192, 503 N.E.2d 1198 (4th Dist.1987). In that case, a doctor who had examined a young girl and found no hymen testified that she could not attribute any significance to the absence of hymen because only 50–60% of three-year olds have an intact hymen. *Id.,* 151 Ill.App.3d at 1025, 105 Ill.Dec. 192, 503 N.E.2d at 1199. Howard's trial counsel appeared to be at least generally aware of the existence of medical testimony downplaying the significance of an unintact hymen, because in his cross-examination of Dr. Blade–Schlessinger he asked, "And the fact that a hymen is not intact, that's a normal part of a woman's development, isn't it?" R. 372. Dr. Blade–Schlessinger disagreed, stating that a hymen becomes unintact "[o]nly if something penetrates it." *Id.*

cure for expert testimony of dubious scientific validity is vigorous cross-examination. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993). For all of these reasons, Howard has failed to make a case that his appellate counsel prejudiced him by not attacking the scientific basis for Dr. Blade–Schlessinger's opinions.

*Improper Prosecutorial Remarks*

The second issue that Howard wished his appellate counsel to raise is the cumulative effect of several instances of claimed prosecutorial misconduct. Many of these instances involved suggestions by the prosecution that Howard was charged with a crime in 1983 related to his alleged abuse of Tamika, and that, as a result of a DCFS investigation that same year, Howard was denied visitation with Tamika.

The comments at issue began during the State's re-direct examination of Linda Fletcher. After eliciting testimony that Fletcher had taken Tamika to Dr. Rosen in 1983 to be examined for signs of abuse, the following exchange took place:

Q: And after that there was a DCFS investigation, is that correct?

A: Yes, there was.

Q: Was Sherman Howard allowed unsupervised contact with his daughter after that DCFS investigation?

MR. KLOAK [Howard's attorney]: Objection.

THE COURT: Sustained, stricken.

Trial transcript ("Tr.") at 64–66. A sidebar took place, in which the trial judge noted that there was no evidence in the record of any restrictions placed on Howard as a result of the DCFS investigation, and that such evidence could not be introduced through Fletcher's testimony because it would be hearsay. Nevertheless, when the re-direct examination resumed, the State immediately implied again that Howard's visitation had been restricted. ("Q: After you took Tamika to the doctor, Dr. Rosen, in 1983, the defendant was allowed to see Tamika eventually, is that correct?") Howard's attorney again objected, and the court sustained the objection.

A short time later, the prosecutor asked Fletcher, "Drawing your attention to October of 1985, who kidnapped Tamika?" Howard's attorney objected, and the judge sustained the objection on the basis that it called for a legal conclusion. There is nothing in the record to explain the State's reference to kidnapping.

The prosecution's remaining improper comments came during closing arguments. The prosecution referred again to Howard being "charged with sexual abuse": "Doctor Simon Rosen examined [Tamika], and we know from that that he was charged with sexual abuse in May of '83." Tr. 148. Howard's attorney objected; the court sustained the objection and instructed the jury to disregard the comment. The prosecutor went on to say, "And in October of '85, in September of '86, the Defendant and Sheila [Tamika's mother] are on the outs, and he tells you about that himself, and again there is problems with D.C.F.S. ...." Tr. 149. Howard's attorney did not object to this statement, although no evidence of any such "problems" appears in the record. Finally, attacking Howard's credibility, the prosecutor stated: "Look at the Defendant's credibility. How he tried to shy around sexual allegations in 1983 ...." and "He thinks because he escaped responsibility for this once before that he can do it again." Tr. 156, 157. Howard's attorney did not object to these statements.

These repeated references to DCFS-imposed restrictions on Howard's visitation with Tamika following that agency's 1983 investigation into allegations of abuse, "problems with DCFS" in 1985, criminal "charges of sexual abuse" or "sexual allegations" brought in 1983, Howard's "escaping responsibility for this once before," and kidnapping—none of which were supported by evidence in the record—are clearly deliberate and improper prosecutorial comments. The State argues that all but the kidnapping comment were proper statements, as Howard's indictment included charges for sexual assaults that took place between 1983 and 1986. Thus, it reasons, references to "charges of sexual abuse" related to 1983 assaults were simply referring to the charges on which

Howard was then standing trial. The flaw in this argument is that the clear implication of the prosecutor's "repeated insinuations [of] crimes not in evidence," as Howard puts it, was that "the prosecutor knew that [Howard] was involved in other criminal misconduct and that she had knowledge of evidence not before the jury which showed [Howard's] guilt of the present offense." Pet'n for Post–Conviction Relief at 6, 7 (emphasis added). This improper commentary continued despite the objections of Howard's trial counsel and the rulings of the judge, who sustained the objections and on occasion directed the jury to disregard the comment.

■ Such improper prosecutorial comments may be grounds for a reversal of the conviction where the petitioner can show that the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. De-Christoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). The leading Supreme Court case on improper prosecutorial remarks is *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

In *Darden*, the Supreme Court considered the following factors as relevant to determining whether a petitioner has been deprived of a fair trial: (1) whether the prosecutor's arguments manipulated or misstated the evidence; (2) whether the remarks implicated specific rights of the accused, such as the right to remain silent; (3) whether the defense invited the response; (4) the instructions of the trial court; (5) the weight of the evidence against the petitioner; and (6) whether the defense was afforded an opportunity to rebut the remarks. *Swofford v. DeTella*, 101 F.3d 1218, 1223 (7th Cir.1996) (summarizing *Darden*). These factors vary in the weight accorded them depending on the circumstances of each case. *Rodriguez v. Peters*, 63 F.3d 546, 558 (7th Cir.1995). However, the weight of the evidence against the defendant is the most important factor to be considered in determining whether the prosecutor's remarks violated the defendant's right to a fair trial. *United States v. Gonzalez*, 933 F.2d 417, 431 (7th Cir.1991). "[S]trong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations.'" *United States v. Pirovolos*, 844 F.2d 415, 427 (7th Cir.1988) (quoting *United States v. Young*, 470 U.S. 1, 19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985)).

■ That factor—the weight of the evidence against Howard—leads us to conclude that Howard's right to a fair trial was not unfairly prejudiced by the prosecution's improper remarks. The other factors point in two directions. In Howard's favor, the remarks clearly misstated the evidence, and were not justified by the need to respond to any arguments put forward by the defense. In the State's favor, the remarks did not implicate specific rights of the defendant, and when Howard's attorney objected to four of the remarks or questions, his objections were sustained and the jury was instructed to disregard the remarks. Moreover, Howard's defense attorney generally had the opportunity to rebut the remarks, although as a matter of legal strategy he may have been wise not to draw the jury's attention to the remarks again. All of these factors balance to some extent. The sheer weight of the evidence against Howard, however, supports the conclusion that the jury would have convicted Howard with or without the improper remarks.

Tamika's own testimony about the abuse was strong evidence, a relatively clear and straightforward description of repeated sexual abuse. The testimony of Linda Fletcher corroborated Tamika's story, providing details of her own physical observations of Tamika and Tamika's reports of abuse. Dr. Blade–Schlessinger testified about two earlier medical examinations of Tamika by other doctors, which had shown an unintact hymen, although her own examination revealed an intact hymen and no neovascularization. She then theorized that hymen regeneration could explain the intact hymen she saw.

To counter this testimony, Howard's defense attorney attempted to impeach Linda Fletcher on the basis of bias, arguing that she had a motive to lie in order to protect her custody of Tamika. Howard himself

took the stand, as did another witness who cared for Tamika from time to time, to testify that Howard did not abuse Tamika sexually. The defense evidence created a credibility question that was within the province and ability of the jury to resolve. Nevertheless, although the defense attorney was able to raise a credibility issue, this Court finds that the evidence of Howard's guilt—set forth at more length earlier in this opinion—was more than sufficient to overcome any potential prejudice caused by the appellate court's inability to review the issue of prosecutorial misconduct. We also rely on the fact that the prosecutorial misconduct was in general properly controlled by the trial court during Howard's trial. Accordingly, Howard has failed to demonstrate that his appellate counsel's deficiencies in not raising the issue of prosecutorial misconduct met the prejudice prong of *Strickland v. Washington*, i.e., that without those deficiencies he would be entitled to the reversal of his conviction or a new trial. *See generally Hennon v. Cooper*, 109 F.3d 330, 333 (7th Cir.1997) (even egregious violations of prosecutor's duty not to abuse jurors' trust were unlikely to have affected the verdict where there was strong evidence of guilt and the trial judge sustained several objections to the improper comments).

*Reasonable Doubt, Hearsay*

■ The last two arguments Howard asked his appellate counsel to raise are more easily disposed of. Howard argues that the prosecutor's statements misstated the reasonable doubt standard, and were not adequately corrected by the judge.

In the prosecution's first closing argument: MS. STEWART (prosecutor): Tamika's testimony alone would convict this man of this crime. Tamika's testimony alone will make him responsible for what he's done to that child for years. But you have more than that. . . .

■ In the prosecution's rebuttal closing argument:

MS. DOOLING (prosecutor): As my partner told you and as I told you, if you believe Tamika that in and of itself is enough to convict. You are able to convict on that evidence alone.

MR. KLOAK (Howard's attorney): Objection, your Honor.

THE COURT: Overruled.

MS. DOOLING: The testimony of one witness—

THE COURT: Please continue.

MS. DOOLING: The testimony of one witness who is clear and convincing and credible is enough right there to convict. The other evidence in this case—

MR. KLOAK: Objection. It has to be proof beyond a reasonable doubt. Objection.

THE COURT: I still overrule your objection. She is simply stating that the testimony of one witness is sufficient to convict in a criminal case. That is the law.

I acknowledge that the proof must be beyond a reasonable doubt. The law is quite clear that one witness can certainly present evidence beyond a reasonable doubt. Overruled.

Tr. 144, 188–89. Howard argues that the State in effect encouraged the jury to apply a "clear and convincing" standard of proof to his determination of guilt instead of the higher "reasonable doubt" standard that is required in criminal trials. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). As a brief perusal of the record above shows, this is simply not true. The prosecution merely used the words "clear and convincing and credible" to characterize Tamika's testimony. Both the defense attorney's objection immediately after this statement, and the trial judge's ruling on that objection, stated plainly and definitely that "reasonable doubt" was the proper standard to be applied. Moreover, the trial court expressly instructed the jury that the jury was to apply the "reasonable doubt" standard in its jury instructions.[7] Tr. 206, 209. It is beyond doubt that these repeated instruc-

---

7. The trial judge did not define "reasonable doubt" in its jury instructions. Under Illinois law, "neither the court nor counsel should attempt to define the reasonable doubt standard for the jury." *People v. Speight*, 153 Ill.2d 365, 374, 180 Ill.Dec. 97, 100, 606 N.E.2d 1174, 1177 (1992).

tions to the jury cured any misperception that may have been created by the prosecutor's remarks, which in any event were not improper.[8]

▮ The last argument Howard wished his appellate attorney to raise was that the testimony of Linda Fletcher concerning Tamika's statements to her about abuse was improperly admitted hearsay. Although Howard's trial attorney did object to the hearsay nature of some of Fletcher's testimony, these objections related to Fletcher's tendency to describe events in terms of the conversations she had with others, rather than through personal knowledge. Howard's trial attorney did not object to the introduction of Fletcher's descriptions of Tamika's reports of abuse to her. Thus, it appears that this issue was waived on appeal.

Moreover, Fletcher's testimony would not have been considered hearsay anyway. At the time of trial, an Illinois statute created a hearsay exception in prosecutions for child sexual abuse, allowing into evidence:

(1) testimony by [a] child that he or she complained of such act [sexual abuse] to another; and

(2) testimony by the person to whom the child complained that such complaint was made in order to corroborate the child's testimony.

Ill.Rev.Stat. ch. 38, § 115–10 (1985) (since amended and codified at 725 ILCS 5/115–10(a)). Howard argues that several of Fletcher's statements do not fall within § 5/115–10 (a)(2), because they are not "corroboration" of Tamika's testimony. He focuses especially on Fletcher's statements about alleged abuse in 1983 and 1985, because Tamika did not testify to abuse occurring in 1983 or 1985. (The only date Tamika could remember specifically in connection with the abuse was December 1986, the time of her sister's birth.)

Tamika testified that her father put his penis into her vagina three or four times before December 1986, and that he twice made her put her mouth on his penis. Tamika also stated that she told her aunt, Linda Fletcher, about these events. Tr. 221–31. We find that these general statements are sufficient to open the door to Fletcher's corroboration of Tamika's reports of abuse. Fletcher could testify based on her own knowledge about the dates of these conversations; such testimony would of course not be hearsay. Because the disputed testimony was not hearsay under 725 ILCS 5/115–10, and in any event Howard's trial attorney failed to object to the testimony, thereby waiving the issue on appeal, Howard was not prejudiced by the failure of his appellate counsel to raise the hearsay issue Howard identified.

## CONCLUSION

For all of the foregoing reasons, the Court finds that Howard was not denied a fair trial by the ineffective performance of his appellate counsel, and denies Howard's petition for a writ of habeas corpus. In so doing, we remind Howard that this Court's role is not to conduct an appellate review of his conviction, but only to determine whether he was deprived of those federal rights that are enforceable in a habeas corpus proceeding. *See Tyson v. Trigg*, 50 F.3d 436, 438 (7th Cir.1995).

**8.** In Illinois, the testimony of one person may be sufficient evidence to convict if that testimony creates proof beyond a reasonable doubt. *People v. Novotny*, 41 Ill.2d 401, 411, 244 N.E.2d 182, 188 (1968). This may be true even when the witness is a juvenile. *See In re D.R.S.*, 267 Ill. App.3d 621, 624–26, 205 Ill.Dec. 548, 550–52, 643 N.E.2d 839, 841–43 (5th Dist.1994) (testimony of a single witness, a juvenile accomplice of the defendant, was sufficient to convict).