J-S81015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
ELVIS AARON RICCARDI   :
  :
Appellant   :   No. 824 MDA 2017

Appeal from the PCRA Order April 24, 2017
In the Court of Common Pleas of Luzerne County
Criminal Division at No(s):  CP-40-CR-0003649-2009

BEFORE:   PANELLA, J., STABILE, J., and PLATT*, J.

MEMORANDUM BY PANELLA, J.                    **FILED MAY 04, 2018**

Elvis Riccardi appeals from the order dismissing his first petition pursuant to the Post Conviction Relief Act ("PCRA"). He raises fourteen separate challenges to the PCRA court's order. After careful review, we affirm.

A jury convicted Riccardi of kidnapping, robbing, and ultimately killing Donald Skiff, Jr. The court imposed a sentence of life in prison plus an additional 60 to 110 years. Both this Court and the Supreme Court of Pennsylvania affirmed the judgment of sentence.

Shortly thereafter, Riccardi filed this PCRA petition. After numerous supplements and amendments, the court held an evidentiary hearing on the

_____

* Retired Senior Judge assigned to the Superior Court.

merits of the petition. The PCRA court then dismissed the petition. This timely appeal followed.

Preliminarily, we must comment on the brief submitted by Ricciardi's counsel, Enid Wolfe Harris, Esquire. Issue selection is a key hallmark of appellate advocacy. Attorney Harris has tossed aside careful issue selection and has opted for a shotgun approach, raising fourteen issues.

Justice Robert H. Jackson warned of the dangers of this approach many years ago:

> Legal contentions, like the currency, depreciate through overissue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at a lack of confidence in any one. Of course, I have not forgotten the reluctance with which a lawyer abandons even the weakest point lest it prove alluring to the same kind of judge. But experience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.

Ruggero J. Aldisert, J. "Winning on Appeal: Better Briefs and Oral Argument," at 129 (2d ed. 2003) (quoting Robert H. Jackson, "Advocacy Before the United States Supreme Court," 37 Cornell L.Q. 1, 5 (1951)). This "much quoted" advice, unfortunately, "often 'rings hollow'...." ***Commonwealth v. Robinson***, 864 A.2d 460, 480 n.28 (Pa. 2004) (citing Ruggero J. Aldisert, J. "The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982)). But its importance cannot be overstated. ***See***, ***e.g.***, ***Jones v. Barnes***, 463 U.S. 745, 751-752 (1983) ("Experienced advocates since time

beyond memory emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues"); **Howard v. Gramley**, 225 F.3d 784, 791 (7th Cir. 2000) ("[O]ne of the most important parts of appellate advocacy is the selection of the proper claims to urge on appeal. Throwing in every conceivable point is distracting to appellate judges, consumes space that should be devoted to developing the arguments with some promise, inevitably clutters the brief with issues that have no chance … and is overall bad appellate advocacy."); Aldisert, *supra* at 129 ("When I read an appellant's brief that contains more than six points, a presumption arises that there is no merit to *any* of them.")

We proceed by determining whether the PCRA court's factual findings are supported by the record. **See Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa. Super. 2012). In doing so, we read the record in the light most favorable to the prevailing party. **See id**. If this review reveals support for the PCRA court's credibility determinations and other factual findings, we may not disturb them. **See id**. We, however, "afford no such deference to its legal conclusions." **Id**., at 1194 (citations omitted).

Eight of Riccardi's issues on appeal assert ineffective assistance of either trial counsel (issues 1, 2, 3, 4, 5, 6, and 10) or appellate counsel (issue 13) (in either instance, referred to as "IAC"). We assume counsels' effectiveness and Riccardi bore the burden of proving otherwise. **See Commonwealth v.**

***Brown***, 161 A.3d 960, 965 (Pa. Super. 2017). To do so, Riccardi was required to plead and prove the underlying issue has arguable merit, counsel did not act or fail to act pursuant to an objectively reasonable strategy, and actual prejudice resulted from counsels' act or failure to act. ***See Commonwealth v. Rykard***, 55 A.3d 1177, 1189-1190 (Pa. Super. 2012). A failure to satisfy any prong of the test will require rejection of the entire claim. ***See Commonwealth v. Spotz***, 84 A.3d 294, 311 (Pa. 2014).

Riccardi first challenges the PCRA court's conclusion that trial counsel had a conflict of interest in representing him. Riccardi notes that another lawyer in trial counsels' firm represented the Luzerne County District Attorney in an unrelated federal case. As such, Riccardi argues that trial counsel suffered from an actual conflict of interest.

An attorney owes his client a duty of loyalty, including a duty to avoid conflicts of interest. ***See Strickland v. Washington***, 466 U.S. 668, 688 (1984). However, an appellant cannot succeed in a claim for a potential conflict of interest without establishing that he suffered some form of prejudice. ***See Commonwealth v. Collins***, 957 A.2d 237, 251 (Pa. 2008). On the other hand, if an appellant is able to show that trial counsel experienced an actual, rather than potential conflict of interest, prejudice is presumed. ***See id***. "To show an actual conflict of interest, the appellant must demonstrate that: (1) counsel actively represented conflicting interests; and

(2) those conflicting interests adversely affected his lawyer's performance." *Id*. (citations and internal quotation marks omitted).

Riccardi does not highlight any direct evidence of improper communication between the lawyers, nor does he identify any undue influence exerted by the firm upon trial counsel. Rather, he contends that his other allegations of trial counsel ineffectiveness demonstrate counsels' desire to curry favor with the District Attorney. As such, for this claim to entitle Riccardi to relief, we must conclude that at least one of his other IAC claims on appeal has merit. As we demonstrate below, Riccardi cannot meet this requirement.

In his second claim of IAC, Riccardi argues counsel were ineffective when they failed to object to evidence of his prior crimes. Riccardi highlights two specific instances where Commonwealth witness Gary Moore testified to Riccardi's prior bad acts.

First, Moore testified that Riccardi had a swastika tattooed on his chest. *See* N.T., Jury Trial, 6/20-28/11, at 161. Riccardi argues this testimony prejudiced the jury "by showing him to be a person of bad character." Appellant's Brief, at 35.

"Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002) (citation omitted). However, it is impermissible to present evidence at trial of a defendant's prior bad acts or crimes in an attempt to establish the

defendant's criminal character or tendencies. **See Commonwealth v. Hudson**, 955 A.2d 1031, 1034 (Pa. Super. 2008); Pa.R.E. 404(b)(1). Such evidence, however, may be admissible "where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." **Commonwealth v. Russell**, 938 A.2d 1082, 1092 (Pa. Super. 2007) (citation omitted). "[E]vidence of other crimes, wrongs or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or lack of accident." Pa.R.E. 404(b)(2).

The PCRA court concluded the testimony about Riccardi's swastika was admissible as evidence of identity under Pa.R.E. 404(b)(2). Riccardi contends that identity evidence was not necessary, as "Moore knew Riccardi without needing to look at tattoos[.]" Appellant's Brief, at 35. However, our review of the transcript leads us to conclude that Moore's ability to identify Riccardi was certainly subject to attack on cross-examination.

Moore testified he was sitting in a bar when "[t]wo guys walked in." N.T., Jury Trial, 6/20-28/11, at 161. He testified a man named "Elvis Lewis" had a tattoo of a swastika on his chest. **Id**. He did not know Elvis Lewis by any other name. **See id**. He further admitted that he did not recognize Lewis until he questioned the bartender about him. **See id**. Moore then identified Riccardi as the man he knew as Elvis Lewis. **See id**., at 162. Thus, we agree with the PCRA court that Moore's testimony was admissible as a means to

bolster his identification testimony. Riccardi cannot establish arguable merit for this claim.

Next, he argues counsel were ineffective when they failed to request a curative instruction when Moore testified that Riccardi offered to sell him cocaine. ***See id***., at 163. Counsel objected, and a side-bar argument ensued. Counsel requested a mistrial. ***See id***., at 164. The prosecutors argued this testimony was only being used to further bolster the identification of Riccardi. ***See id***., at 165-166. "There's an identification at issue. [Moore] says he knew [Riccardi] from Nanticoke. He was comfortable with him; and that's what we're trying to show, that this definitely is Elvis Riccardi, the same person he called Elvis Lewis." ***Id***., at 166. Counsel rebutted this argument by noting the offer to sell cocaine was not necessary to prove identification. ***See id***. Ultimately, the court overruled the objection without stating a basis for its ruling. ***See id***., at 167. The Commonwealth then had Moore re-state his testimony that Riccardi had asked him if he wanted to buy cocaine. ***See id***., at 168.

Riccardi argues counsel should have asked the court to instruct the jury that this testimony could only be used for identification purposes. ***See***, ***e.g.***, ***Commonwealth v. Billa***, 555 A.2d 835, 841 (Pa. 1989). The PCRA court cites case law indicating that counsel can make a reasonable strategic decision to not request such an instruction, as the instruction may merely serve to highlight the testimony for the jury. ***See***, ***e.g.***, ***Commonwealth v. Hutchinson***, 811 A.2d 556, 561-562 (Pa. 2002). However, when counsel was

questioned on the issue of his strategy regarding this decision, he testified he did not request the instruction because he did not believe identification was at issue. *See* N.T., PCRA Hearing, 10/3/16, at 159, 183-184.

The PCRA court concluded Moore's testimony that Riccardi offered to sell him cocaine was not inflammatory, graphic, or extensive. However, it is clear the Commonwealth sought to emphasize the offer to sell cocaine, as it had Moore repeat the testimony after Riccardi's objection was overruled.

We conclude Riccardi has failed to establish prejudice in light of the overwhelming evidence of his guilt. This Court summarized the evidence against Riccardi in his direct appeal:

> The state police found Skiff's partially burned truck in an area known as Plymouth Flats. The state police fire marshall determined that the fire to the truck had been intentionally set. Investigators obtained two palm prints from the truck, which were later determined to match Riccardi's palm print. Investigators also learned that Skiff's ATM card had been used the evening before he was last seen. A video from the ATM showed Skiff in his truck with Riccardi and his co-defendant, Michael Simonson[]. Bank records showed that there were two withdrawals and two failed withdrawals from Skiff's account on the night he was last seen. Skiff's body was eventually found thirty-two miles from where he was last seen. The investigators spoke with Riccardi on several occasions and Riccardi, while not admitting murder, gave incriminating statements.
>
> At trial, the Commonwealth presented witnesses who testified that Riccardi had made various admissions to them regarding Skiff's disappearance and murder. A forensic pathologist testified that the manner of death was homicide. Riccardi called Simonson as a witness, but Simonson exercised his Fifth Amendment right and did not testify. [Simonson had pled guilty to charges arising from the murder of Skiff, but he still had other other pending charges.] However, a state trooper testified as to a statement Simonson had made to the police regarding this case.

*Commonwealth v. Riccardi*, No. 158 MDA 2012, at 2-3 (Pa. Super., filed 4/16/13) (unpublished memorandum).

Riccardi cannot establish with any probability that Moore's testimony had an impact on the jury's verdict. Any prejudice caused by the reference to cocaine was surely dwarfed by comparison to the extensive evidence of Riccardi's guilt in kidnapping and murdering Skiff. We therefore conclude there is no merit to Riccardi's second issue on appeal.

Riccardi's third, fourth, and tenth issues all assert IAC arising from the testimony of forensic pathologist Dr. Gary Ross. In fact, Dr. Ross's testimony forms the basis of Riccardi's third, fourth, seventh, eighth, ninth, tenth, eleventh, and twelfth issues on appeal. We will therefore present the portion of his testimony that Riccardi focuses on in detail here for reference in subsequent issues.

On direct examination, the Commonwealth questioned Dr. Ross about Skiff's hyoid bone. *See* N.T., Jury Trial, 6/20-28/11, at 666. Dr. Ross noted that Skiff's hyoid bone was found to be missing from his corpse. *See id*. The prosecutor then asked Dr. Ross to opine on possible causes for the absence. *See id*., at 667. Counsel objected to this question, but the court overruled the objection. *See id*.

Dr. Ross testified that a direct trauma to the neck might have been the cause of the missing hyoid bone. *See id*., at 667-668. The prosecutor followed up by asking if "an injury to someone's neck" would be enough to kill them.

*Id*., at 668. Dr. Ross responded, "Certainly. It can be, not necessarily, but it certainly can be." *Id*.

The prosecutor continued by asking Dr. Ross, "if someone were to receive a fatal injury to the neck, would the spine necessarily be broken or fractured?" *Id*. Counsel objected, asserting these opinions were outside the scope of Dr. Ross's experts reports. The prosecutor responded by noting the absence of the hyoid bone was in Dr. Ross's report, even if the opinions on the cause of its absence were not. *See id*., at 669-670. The trial court overruled the objection without stating a basis for the ruling. *See id*., at 670.

Dr. Ross continued to explain his finding pursuant to the prosecutor's questioning. Importantly, he testified

> [a]ll the vertebrae or the segments of the backbone were present; and the soft tissue about the vertebrae and basically all the soft tissue about the bony structures were absent. So, basically, I was left with the skeleton with a few fragments of necrotic or decomposing or rotten tissue attached to those bony fragments.
>
> I didn't see any evidence of definitive, blunt traumatic impact by my examination of the vertebrae, the ribs, pelvis, extremities or the head.

*Id*., at 676.

Still later in his direct testimony, he discussed a defect he found in Skiff's skull.

> Well, that marking on the skull, when I initially did the autopsy, I thought – I didn't know the significance of that particular defect. I didn't know it was pre-mortem or post-mortem.

> After reviewing the photographs and looking at the autopsy again, I still don't know whether that is pre-mortem or post-mortem; but I issued a report saying I really didn't know what that defect was.
>
> …
>
> That cause of the hole is due to some force penetrating the skull in that particular area. I just don't know what caused that penetration of that skull in that area, and I don't know if it was done prior to his death or after his death.

*Id*., at 702-703. At the conclusion of his direct testimony, Dr. Ross opined that the cause of Skiff's death was "undetermined" due to the decomposition of the body. *Id*., at 706.

On cross-examination, Dr. Ross again conceded he could not determine the cause of death "with a reasonable degree of medical certainty." *Id*., at 708. When asked about the missing hyoid bone, Dr. Ross stated it "was absent due to decomposition" and possibly because investigators failed to locate the small bone when they recovered the body. *Id*., at 709. He denied that he could say, within a reasonable degree of medical certainty, that Skiff had been struck in the neck prior to his death. *See id*.

In his third issue on appeal, Riccardi contends trial counsel were ineffective for failing to call their own forensic expert, Dr. William Manion. He argues Dr. Manion would have disputed Dr. Ross's conclusion regarding the defect in Skiff's skull. At the PCRA hearing, Dr. Manion testified he would have opined that he did not see the defect in the x-rays of Skiff's skull if he had been called to testify at trial. *See* N.T., PCRA Hearing, 9/22/16, at 24-25. However, he subsequently testified he agreed the defect was present based

upon his review of photographs of Skiff's skull. *See id*., at 32. He also opined that the conclusions reached by Dr. Ross in his autopsy report were accurate. *See id*.

Under these circumstances, we can see no arguable merit to the claim that Dr. Manion should have been called to testify at trial. First and foremost, Dr. Ross admitted he could not determine whether the defect in the skull was pre- or post- mortem. He could not determine a cause for Skiff's death; all he could do was speculate. Dr. Manion's testimony was not necessary to refute the prosecutor's contention that Skiff was killed by a blunt force trauma to the skull; Dr. Ross's testimony established the contention was mere speculation.

Furthermore, the record establishes Dr. Manion agreed with Dr. Ross's conclusions, except for the minor quibble that he did not see the defect in the x-rays, only in the photographs. Riccardi has not established any valid reason for trial counsel to have called Dr. Manion. His IAC claim on this basis therefore fails.

Next, Riccardi claims trial counsel were ineffective in failing to object to the prosecutor's closing argument. Specifically, he highlights the prosecutor's argument that Riccardi put Skiff face down, "and he started to hit him and hit him and hit him and hit him with the stick." N.T., Jury Trial, 6/20-28/11, at 1342.

A prosecutor is given wide latitude to argue her case, so long as the argument is based upon the evidence of record and reasonable inferences

from it. **See Commonwealth v. Luster**, 71 A.3d 1029, 1048 (Pa. Super 2013) (*en banc*). Thus, the prosecutor's arguments are not a valid basis for reversal unless they clearly biased the jury against the defendant to such an extent that the jury could not have rendered an objective verdict. **See id**. We must view the argument as a whole, and not in isolated statements taken out of context. **See id**.

As noted, Dr. Ross testified he could not opine as to the cause of Skiff's death to a reasonable medical certainty. He acknowledged a blow to the back of the skull could be consistent with his observations, but there was no way to be certain. This, along with the discovery of a stick beneath Skiff's body allowed the prosecutor to argue for a reasonable inference that Skiff had been beaten with the stick. Furthermore, since Riccardi was on trial for the murder of Skiff, it is difficult to conclude that this inference was significantly worse than any other method of murder, such that it would have unfairly biased the jury. Thus, Riccardi has failed to establish that his IAC claim has arguable merit.

In his fifth issue on appeal, Riccardi argues trial counsel were ineffective when they did not seek to exclude all DNA evidence relating to Skiff. Riccardi claims the evidence should have been excluded as the Commonwealth did not preserve sufficient samples to allow for independent testing when it allowed Skiff's body to be cremated.

Directly at issue is one of Riccardi's sneakers. The Commonwealth presented evidence that Skiff's DNA was found on the sneaker. Riccardi believes independent testing may have been able to rebut the Commonwealth's evidence.

Riccardi contends the cremation of Skiff's body constitutes a violation of **Brady v. Maryland**, 373 U.S. 83 (1963). In **Brady**, the Court decided, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." **Id**., at 87. In contrast, where the evidence is not inherently favorable, but merely potentially useful, to the defendant, there is no violation of the defendant's rights unless he can show the Commonwealth acted in bad faith. **See Commonwealth v. Chamberlin**, 30 A.3d 381, 402 (Pa. 2011). Bad faith exists where evidence is destroyed under circumstances "in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." **Arizona v. Youngblood**, 488 U.S. 51, 58 (1988).

Here, Riccardi has not established that Skiff's DNA would have been favorable to him. Rather, he has set forth a scenario under which the DNA was potentially useful. **See** Appellant's Brief, at 39 ("*if* the DNA did not belong to Donald Skiff, Riccardi's [sneaker] had no contact with Mr. Skiff") (emphasis

supplied). As such, he was required to demonstrate bad faith on the part of the Commonwealth.

The PCRA court did not err in finding Riccardi had failed to establish bad faith. Skiff does not cite to any evidence of bad faith. Our review of the record reveals only that Skiff's remains were released to his family, who then decided to have the remains cremated. *See* N.T., PCRA Hearing, 10/3/16, at 29-30. This evidence certainly falls short of establishing conduct by the Commonwealth that would indicate they believed it would have yielded exonerating evidence.

Next, Riccardi claims counsel were ineffective when they failed to object to Dr. Ross's opinion that, under the circumstances where Skiff's body was found, the manner of death was presumed to be "homicide until proven otherwise." While Riccardi is correct in noting this would be an inappropriate standard for the jury to use when determining his guilt, he has not established the jury was swayed into using this standard.

Initially, we note that Dr. Ross's testimony merely described his process for reaching a conclusion on whether a person died from natural causes or from homicide. He was not addressing the issue of who was responsible for Skiff's death. Nor did the highlighted testimony suggest the jury should presume the cause of death was homicide.

Furthermore, Riccardi does not challenge, or even mention, the trial court's instructions to the jury. The court directed the jury that

[i]t is not the Defendant's burden of proof to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crimes charged and that the Defendant is guilty of those crimes beyond a reasonable doubt.

N.T., Jury Trial, 6/20-28/11, at 1362-1363. The court repeated similar instructions regarding the burden of proof throughout its jury charge. ***See***, ***e.g.***, ***id***., at 1395 (describing the Commonwealth's burden to establish every element of each allegation of theft beyond a reasonable doubt). We presume the jury followed these instructions. ***See Commonwealth v. Miller***, 819 A.2d 504, 513 (Pa. 2002). Thus, Riccardi has not established arguable merit for this claim of IAC.

In his seventh claim on appeal, Riccardi argues the Commonwealth violated his rights to due process by allowing Dr. Ross to testify to the presence of hole in Skiff's skull. Riccardi claims Dr. Manion conclusively established the absence of such a hole, and that the Commonwealth allowed Dr. Ross to present knowingly false testimony.

This argument mischaracterizes the evidence. As set forth above, Dr. Manion disputed that the hole could be seen in the x-rays, but agreed that the hole was present after reviewing photographs. Even if Dr. Manion had opined that there was no hole, this dispute would not have rendered Dr. Ross's testimony knowingly false. It would have merely established a disagreement between experts to be resolved by the jury. Riccardi's seventh claim on appeal is frivolous.

We reach the same conclusion for Riccardi's eighth issue, wherein he claims his due process rights were violated when the Commonwealth failed to correct Dr. Ross's allegedly false testimony regarding the hole in Skiff's skull. As we have established, Riccardi has come nowhere near meeting his burden in establishing that Dr. Ross's testimony was, in fact, false. Riccardi's eighth issue is similarly frivolous.

Riccardi's ninth issue clearly suffers from the same defect. He contends the prosecutor compounded the violation of his rights occasioned by Dr. Ross's alleged false testimony by arguing that the hole in Skiff's skull represented the cause of death. We need not belabor this point yet again; this issue is frivolous.

Riccardi's next two claims, his tenth and eleventh on appeal, assert trial counsel were ineffective when they failed to correct Dr. Ross's allegedly false testimony through cross-examination or through the presentation of Dr. Manion's expert testimony. Once again, these arguments mischaracterize the evidence of record. As set forth previously, Dr. Manion ultimately agreed with Dr. Ross's findings and conclusions, with the minor quibble that he only observed the hole in Skiff's skull in photographs, not in the x-rays. These issues are frivolous.

Next, Riccardi argues the Commonwealth violated his due process rights by failing to disclose that it had allegedly coached its expert witness during a pre-trial hearing. The hearing at issue was held to determine whether Riccardi

qualified as mentally challenged such that the death penalty would constitute cruel and unusual punishment under *Atkins v. Virginia*, 536 U.S. 304 (2002). Even assuming the validity of Riccardi's assertions on this issue, he cannot establish he was prejudiced by the Commonwealth's conduct. The testimony was not presented to the jury for purposes of determining guilt or innocence. Nor did it ultimately have an impact on his sentence, as he did not receive the death penalty. Since Riccardi cannot establish any form of prejudice, this claim fails.

In his thirteenth issue, Riccardi asserts that appellate counsel was ineffective in his performance on appeal. While the record certainly supports Riccardi's claim that appellate counsel procedurally defaulted several issues on appeal, leading to their waiver, Riccardi makes no attempt to argue he suffered prejudice from counsel's mistakes. His whole argument on this issue consists of a single sentence: "It cannot be determined what this Court would have decided if appellate counsel had included the photographs and videos in the certified record or made the effort to support his arguments on sufficiency of the evidence by citing to the record."[1] This argument cannot meet the high standard of establishing the PCRA court erred.

---

[1] Riccardi also argues prejudice is established by the fact that trial counsel were suffering from a conflict in interest: "the PCRA hearing testimony showed that [trial counsel] were burdened by an actual conflict of interest. Had the issue been raised on direct appeal, Riccardi would be entitled to relief." As set forth previously, we do not agree that Riccardi established he was prejudiced by any conflict of interest.

In his final issue, Riccardi claims that the cumulative effect of the errors in this case prejudiced him. As we conclude that the PCRA court did not err on any of the issues raised by Riccardi on appeal, this claim necessarily fails. Furthermore, Riccardi has failed to establish any prejudice related to his claim that trial counsel suffered from a conflict of interest. As such, none of Riccardi's claims merit relief, and we affirm the order dismissing his PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/4/2018